GEORGE M. WAKEFIELD ET AL. v. THE SUNDAY LAKE
MINING COMPANY.

*Landlord and tenant—Mining lease—Forfeiture—Waiver—Collusive
entry—Quieting title.*

1. The failure to pay the royalties reserved in a mining lease when
due will not, in and of itself, work a forfeiture, where the
lease does not provide that in the event of such non-payment
it shall become void; citing *Dare v. Boylston,* 6 Fed. Rep. 493;
*White v. Lee,* 5 Ban. & A. 572; *Cheney v. Bonnell,* 58 Ill. 268.

2. A party cannot found a possession entitled to recognition by a
court of equity upon an entry made by collusion with the ser-
vant of the actual occupant, nor can a possession necessary to
support a bill to quiet title be predicated upon an entry secured
by misrepresentation as to its purpose; citing *Farmer v. Hunter,*
45 Mich. 337; *Newton v. Doyle,* 38 Id. 645; *Watson v. Brewing
Co.,* 61 Id. 595.

3. A mining lease prohibited the cutting of timber for the private
use of the lessees or their employés, and contained a forfeiture
and re-entry clause, to become operative in case of the non-
payment of the royalties and taxes agreed to be paid by the
lessees, or in case of the non-performance of any of the cov-
enants of the lessees at any of the times fixed for such per-
formance; which clause is held not to apply to a breach of
the provision forbidding the cutting of timber.

4. Upon the facts of this case, as stated in the opinion, it is held:
*a*—That the assurance given to the defendant by the com-
plainants at the time of the service of notice to quit, that
another notice would be given before any proceedings were
taken, deferred the right of re-entry until such notice should
be given.

*b*—That the subsequent assurances given to defendant's offi-
cers, as to the time in which the royalties might be paid under
the statute authorizing summary proceedings for the recovery
of the possession of lands, further deferred the right of re-entry
until such time should elapse, or until notice of the abandon-
ment of such proceedings should be given.

*c*—That the giving of the notice to quit and of the subse-
quent assurances was notice to the defendant of complainants'
election to proceed to the recovery of possession under the stat-

ute, and there could be no re-entry unless by the abandonment of such proceedings and notice thereof, except pursuant to such statute.

*d*—That the re-entry by complainants' agent (Fink), with the assurance that possession would be surrendered upon payment of the royalties, did not operate as a determination of the lease, but was in recognition of its continuance; and that, the royalties having been paid in full, the continued possession thereafter by complainants was against the just rights of defendant, who is entitled to be restored to possession at once, and to an accounting for all property of the defendant, or connected with the mine, coming into complainants' possession, or taken possession of by them, and for all ore taken from the mine by complainants at its market value when taken, less the royalty to which they are entitled under the lease.

*e*—On such accounting complainants may offset the actual cost of operating the mine since they took possession, together with the actual cost of permanent improvements made upon the mine, and not included in the cost of operating, and also all moneys actually paid out by complainants for labor claims due from defendant on November 19, 1887; but complainants will not be entitled to offset any moneys paid out for or in connection with this litigation, or to officers other than the superintendents and necessary clerical assistants at the mine.

*f*—Complainants will be charged with the $5,000 deposited by defendant as provided in the lease in payment of royalties, and credited with any sum or sums found to have been due from defendant as royalty on December 19, 1887, but without interest.

Appeal from Gogebic. (Daboll, J., presiding.) Argued November 18, 1890, and reargued February 25, 1891. Decided May 8, 1891.

Bill to declare a forfeiture of a mining lease. Defendant appeals. Reversed, and record remanded. The facts are stated in the opinion.

*Ball & Hanscom* and *M. M. Riley* (*Van Dyke & Van Dyke,* of counsel), for complainants, contended:

1. The fact that Mr. Wakefield acted generally in respect to the lease gave him no authority to waive a forfeiture; citing *Doe v. Birch*, 1 Mees. & W. 402; and it is a serious question, per-

haps, whether an agent's authority to waive a forfeiture should not be in writing. To satisfy the statute of frauds, it would seem to require as much authority to reinstate a forfeited lease as to grant a new one.

2. One co-tenant cannot prejudice the rights of the others, and he has no authority, by admission or waiver, to reinstate a forfeited lease in which all of the co-tenants have joined; citing Freem. Co-Ten. §§ 168–170, 172; *Pearis v. Covillaud*, 6 Cal. 617 (65 Am. Dec. 543).

3. The cutting of timber in violation of the lease involved a forfeiture, and it is one of those forfeitures which equity is powerless to redeem; citing *Clarke v. Cummings*, 5 Barb. 339; *Baxter v. Lansing*, 7 Paige, 350; and if the contention of defendant's counsel, that the proviso for re-entry does not apply to this provision of the lease, is correct, which is denied (*Alexander v. Hodges*, 41 Mich. 691), the Court is entitled to consider it under the rule in *Bowser v. Colby*, 1 Hare, 109.

4. The lease provides that "all mines of ore shall be opened, worked, and left in good order and good and workman-like condition at the termination of the lease," etc., which language imports a covenant to work the mines at all times in a workman-like manner. But, independently of this provision, there is an implied covenant, arising from the very subject-matter of the lease, that the lessee shall so work the mine, as to work it otherwise would be waste, against which there is an implied condition in every lease, for the breach of which the landlord may re-enter; citing *U. S. v. Bostwick*, 94 U. S. 53, 65, 66; Taylor, Land. & T. § 252.

5. The conduct of the defendant in permitting its miners to go so long unpaid that they became exasperated and threatened to blow up the pumps and drown the mine, and in permitting the pumps and boiler to be attached,· thus endangering the safety of the mine, and making it necessary for the landlords to step in and take possession of the mine, and guarantee the wages of the striking miners, is such conduct as constitutes a breach of defendant's duty to work the mine in a good and workman-like manner, to which the proviso for re-entry extends, and, if it did not, such right would be implied; citing *Jennisons v. Leonard*, 21 Wall. 302; and, even if this were not so, the Court could consider such breach of duty in determining the question of the right of defendant to relief in this action; citing *Bowser v. Colby*, 1 Hare, 109, 134; *Gram v. Wasey*, 45 Mich. 229.

6. In view of the insolvency of the defendant, as claimed by complainants, is it not fair to presume that, if this Court should

permit this defaulting tenant to redeem its forfeiture caused by its repeated failures to pay rent, it would not only default again at the next rent day, but would disappoint the reasonable expectations of the complainants by failing to perform the lease by properly working the mine? citing *Dunklee v. Adams*, 20 Vt. 415; Pom. Cont. §§ 330, 332, 402.

7. The agreement in question is not a lease, it is a mining license; citing *Harlow v. Iron Co.*, 36 Mich. 105; and to the effect that such a license is in effect a sale, and the royalty the purchase price of the chief article of value in the land, see *Duff's Appeal*, 14 Atl. Rep. 364; *Tiley v. Moyers*, 43 Penn. St. 404.

8. Time is essential in all contracts relating to mines, because of the fluctuating character and value of that class of property; citing Pom. Cont. §§ 383, 384, p. 457 (note 4); *Oil Co. v. Oil Co.*, 21 Hun, 26, 31, 86 N. Y. 638; *Oil Co. v. Marbury*, 91 U. S. 592; *Macbryde v. Weekes*, 22 Beav. 533; *Christie's Appeal*, 85 Penn. St. 463.

9. Act No. 162, Laws of 1885, has dispensed with the necessity for a formal demand of the rent, made on the land on the day it falls due, and authorizes a demand to be made at any time while rent continues in default, thus making the non-payment of rent a continuous cause of forfeiture. If, therefore, such notice is given, and the rent is not paid within the statutory seven days, the lease is determined, and on the next day the landlord may regain possession by peaceable re-entry, by ejectment, or by summary proceedings under How. Stat. § 8295, subd. 2. But whether he re-enters or not is not material, for the reason that the lease is determined by the notice, and thereafter, if the tenant remains in possession, he remains as a trespasser.

10. The possession or entry of one tenant in common, or joint tenant, is always presumed to be in maintenance of the right of all; citing Freem. Co-Ten. § 166; and it seems that one co-tenant has a right, by serving notice to quit, to determine a lease made by several co-tenants; citing Id. § 180; Gear, Land. & T. § 191, notes 36-39.

11. At common law all that was required to complete the forfeiture of a lease which provided for re-entry upon breach of covenants other than that with respect to payment of rent, was some act or deed by the landlord evincing his election that the lease should be terminated; citing Wood, Land. & T. (2d ed.) § 513; and the same doctrine prevails in Michigan; citing *Alexander v. Hodges*, 41 Mich. 694, where Chief Justice CAMPBELL says: "It is claimed, however, that there was no such re-entry as the contract contemplates. Such an entry as

is required by this lease cannot mean any more than a common law entry, and does not involve a successful ouster. A demand at such a time and place that if complied with possession would be at once secured is all that can possibly be needed;" and see *Pendill v. Mining Co.*, 64 Mich. 172.

12. Notice to quit was not necessary; citing *Benfey v. Congdon*, 40 Mich. 283; *Teft v. Hinchman,* 76 Id. 672; *Meno v. Hoeffel*, 46 Wis. 282; *Toal v. Clapp*, 64 Id. 223; *Rowan v. Lytle*, 11 Wend. 620; *Smith v. Littlefield*, 51 N. Y. 539; *Hauxhurst v. Lobree*, 38 Cal. 563.

13. In this case no re-entry was necessary to terminate the mining license, which was merely a demise " for the purpose only of mining iron ore on said land," and the lessors reserved the right to enter on the land at any time for exploration and mining purposes, thus having the possession subject to the license; and no man can re-enter upon himself; citing 2 Smith, Lead. Cas. 145, and cases cited; *Guffey v. Hukill*, 11 S. E. Rep. 754 (W. Va.); *Oil Co. v. Oil Co.*, 21 Hun, 31, 86 N. Y. 638.

14. On the subject of waiving a forfeiture, counsel cited *Croft v. Lumley*, 6 H. L. Cas. 672, 705; *Pendill v. Mining Co.*, 64 Mich. 172; *Alexander v. Hodges*, 41 Id. 694; *Gregory v. Wilson*, 9 Hare, 683.

15. While it is true that relief will ordinarily be given against a forfeiture incurred by the mere non-performance of a pecuniary obligation at the day, upon equitable terms, yet such relief will not be granted in the following instances:

*a*—Where the violation of the contract was the result of gross negligence, or was willful and persistent; citing 1 Pom. Eq. Jur. §§ 452, 455; 2 Story, Eq. Jur. §§ 1321, 1323; Taylor, Land. & T. §§ 495, 496; 2 Washb. Real Prop. *456 (chap. 14, subd. 22); 2 White & T. L. Cas. part. 2, p. 2027; *Hill v. Barclay*, 18 Ves. 62, 63; *Reynolds v. Pitt*, 19 Id. 134; *Rolfe v. Harris*, 2 Price, 206; *Gregory v. Wilson*, 9 Hare, 689.

*b*—If time is made essential, either by the nature of the subject-matter, as in mining agreements, or by the express terms of the agreement; citing 1 Pom. Eq. Jur. § 455; Pom. Cont. §§ 401, 402; 2 Story, Eq. Jur. § 1321, note *c*, subd. 5; *Klein v. Insurance Co.*, 104 U. S. 88; *Thompson v. Insurance Co.*, Id. 252, 258, 260; *Munroe v. Armstrong*, 96 Penn. St. 310, 311.

*c*—If the court cannot feel confident that the defaulting party will thereafter be able to perform his covenant; citing *Dunklee v. Adams*, 20 Vt. 415; *Neale v. Mackenzie*, 1 Keen, 474; *Buckland v. Hall*, 8 Ves. 92.

*d*—When the general conduct of the defaulting party has

85 MICH.—39.

been such as to render it unjust that he should be relieved; citing *Bowser v. Colby*, 1 Hare, 109; *Gram v. Wasey*, 45 Mich. 229.

16. Equity will never, on the ground of mistake, deprive one party of his legal rights under a contract by reason of the mistake of the other party, which he did not cause; citing 2 Pom. Eq. Jur. § 856; 1 Story, Eq. Jur. § 141.

*C. F. Button* and *Turner & Timlin*, for defendant, contended:

1. Forfeiture of a lease is waived by treating the tenancy as still subsisting, or by any statements or acts of the lessor leading the lessee to believe that delay in performance will not prejudice his rights; citing Gear, Land. & T. § 196; *Thropp v. Field*, 26 N. J. Eq. 82; *Horton v. Railroad Co.*, 12 Abb. N. C. 30; *Railroad Co. v. Railway Co.*, 63 How. Pr. 14; *Hughes v. Railway Co.*, 20 Moak, Eng. Rep. 15, 16 Id. 466.

2. If the lease was not terminated, or the forfeiture was waived, the complainants have no standing in a court of equity, for equity will not enforce a forfeiture; citing *Watrous v. Allen*, 57 Mich. 367; *White v. Railway Co.*, 13 Id. 356; *Crane v. Dwyer*, 9 Id. 350; but if a completed forfeiture exists, equity may ascertain that fact, and remove the cloud created by the adverse claim; citing *Pendill v. Mining Co.*, 64 Mich. 172; *Eberts v. Fisher*, 54 Id. 294; and the whole doctrine of waiving or not waiving a forfeiture is a question of intent or election; citing Taylor, Land. & T. § 497.

3. Is there any doubt of Wakefield's intention, after serving notice, upon his own testimony? 'He expected to be paid, and intended to accept the rent and continue the lease. He demanded the rent. A demand for rent accruing after a default known to the lessor, which might work a forfeiture, is a waiver of the right of entry after the default; citing *Camp v. Scott*, 47 Conn. 366; and as to a waiver of forfeiture of title by demand of purchase money, see *Thurber v. Jewett*, 3 Mich. 295; *Giddey v. Altman*, 27 Id. 206; *Deyoe v. Jamison*, 33 Id. 94; *Insurance Co. v. Davenport*, 37 Id. 609.

4. The stipulation giving power of re-entry for the breach of any covenant is strictly construed, and in order to enforce it there must not only be such breach shown as it was the clear and manifest intention of the parties to provide for, but the landlord must show that he has done everything on his part to perfect his right of entry; citing Taylor, Land. & T. § 489;

*Meni v. Rathbone*, 21 Ind. 454; *Palmer v. Ford*, 70 Ill. 369; *The Elevator Case*, 17 Fed. Rep. 200.

5. The notice to quit was invalid, being signed by less than all the tenants in common who granted the lease, and not purporting to terminate the whole lease, or to be for or on behalf of all of the co-tenants; citing *Pickard v. Perley*, 45 N. H. 188 (86 Am. Dec. 153); Taylor, Land. & T. § 479; *Hogsett v. Ellis*, 17 Mich. 351; *Miller v. Havens*, 51 Id. 486; *Bank v. Bank*, 9 Wis. 69; *Calvert v. Bradley*, 16 How. 580.

6. The defendant should, under the testimony, have by the decree relief from the alleged forfeiture; citing *Hughes v. Railway Co.*, 20 Moak, Eng. Rep. 15.

*Russell C. Ostrander*, for defendant.

McGRATH, J. Complainants, residents of Milwaukee, Wis., are owners of certain mining lands in Gogebic county, in the State of Michigan, of which defendant is the lessee. The lease is recorded, and complainants are in possession, and file this bill to quiet title, and enjoin the defendant company, organized under the laws of Wisconsin, and whose officers reside in Milwaukee, from interfering with complainants' possession.

The complainants, on September 28, 1883, executed and delivered to N. D. Moore and S. S. Vaughn a lease for 30 years of certain lands, by the terms of which the lessees were to mine ore on said land, and were to pay to the lessors on all ore mined 50 cents per gross ton. On or before the first Monday of each month the lessees were to furnish to the lessors a sworn statement of the quantity of ore removed from said premises during the preceding month, and were to pay the royalty on the ore so shipped at the Union National Bank of Oshkosh, Wis. This provision was afterwards modified by changing the time for making reports and for payment from the first Monday to the third Monday in each month.

The lessees above named entered upon the said lands, and began operations, and continued the same until Feb-

ruary, 1887, when the lessees aforesaid, with the consent of complainants, assigned all their interest in said lease to the defendant company, and the defendant continued operating said mine until some time in November of that year, making its reports and paying the royalties provided for by said lease, until September, when it failed to report the amount of ore shipped in August, or to pay the royalty upon the same. It failed also to report the ore shipped in September, or to pay the royalty for the same.

The consideration paid by defendant for the transfer of said lease was in the neighborhood of $200,000, and one witness testified that he transferred 33,000 of the 40,000 shares of stock for $5 per share, or $165,000, receiving $83,000 in cash, and 500 shares of other stock. Several witnesses called by defendant fix the value of the plant and leasehold interest at the time that the complainants obtained possession at from $100,000 to $200,000.

The complainants claim that, upon demand made, possession of the premises was surrendered to them; that they have been in the quiet and peaceable possession up to the time of filing their bill, in December, 1887; that on information and belief the defendant has been, and is now, in great financial embarrassment, and is virtually insolvent; that they fear the re-entry of said premises by defendant; that there has been a forfeiture of defendant's rights under said lease; that the lease is null and void; and they pray that it may be so declared, that the lease may be canceled of record, and defendant restrained from interfering with complainants' possession, or with their operations on said premises, and from commencing proceedings at law to recover possession of said premises.

Defendant files an answer in the nature of a cross-bill, and denies its insolvency, or that it at any time voluntarily surrendered or delivered up possession of said premises to complainants, and it denies that complain-

ants peaceably and quietly entered into possession. It admits that in the month of August, 1887, 4,352 gross tons and 1,530 pounds of ore was mined and shipped by it, and in the month of September 3,823 gross tons and 70 pounds of ore was mined and shipped, and that these amounts were not reported as provided in said lease; that on the third Monday in September, 1887, there became due to complainants, as royalties or rent under the lease, $2,176.34, and on the third Monday of October there became due the further sum of $1,917.50; that up to the 19th day of November the defendant had not paid these amounts, or any part thereof; that from the third Monday of September, 1887, until the 18th day of November, defendant made constant and unremitting efforts to pay said sum, but by reason of a temporary embarrassment, from which it was then suffering, it was unable to do so until November 19, 1887, on which day this defendant paid to said complainants, at the place specified in said lease, to wit, at the Union National Bank of Oshkosh, Wis., for royalties due under said lease, the sum of $5,000, by depositing the same in said bank to the order of said complainants, and the same yet remains at said bank, subject to the order of said complainants. Defendant asks to be relieved from the forfeiture, if any be found, to be restored to possession, and for an accounting.

The lease contained the following printed provisions:

"The said parties of the second part may erect buildings, put in engines and machinery, build roads, and do such other things on said premises as may be necessary or proper to carry on such mining; but all such engines, machinery, buildings, and other improvements shall form part of the realty when put up or erected: *Provided,* on the termination of this lease the parties of the second part, by paying up all arrearages which may become due,

owing, or payable to said parties of the first part, their executors, administrators, or assigns, on this lease, within thirty days after such termination of this lease, may remove such buildings, engines, and machinery, but not otherwise."

"But no timber shall be cut on any of said premises for the use of the officers, servants, or any employés of said parties of the second part, either for fuel or otherwise."

"Provided always, and these presents are upon this express condition, that if it shall so happen that the royalty or rent above reserved and agreed to be paid be behind or unpaid at the time or on the days above mentioned for the payment thereof, or in case said taxes or assessments are not paid in due and timely season, or in case of the non-performance of any of the covenants made by the said parties of the second part at any of the times mentioned for the performance thereof, then and from thenceforth it shall and may be lawful for the said parties of the first part, their heirs, executors, administrators, or assigns, into the said demised premises, or any part thereof, in the name of the whole, to re-enter, using such reasonable force as may be necessary, and the same to have again, retain, repossess, and enjoy, and the said parties of the second part, their heirs, executors, administrators, or assigns, and all other tenants or occupiers of the said premises hereby demised, or any part thereof, thereout or therefrom utterly to expel, put out, and remove, and, after such re-entry made, this lease shall wholly cease and determine, and thereby become null and void as it respects the covenants to be performed by the said parties of the first part."

It appears that on the 5th day of November the following notice was served upon H. S. Benjamin, the secretary of the defendant company at Milwaukee, by George M. Wakefield, one of the complainants:

"*To the Sunday Lake Mining Company:*

"You will take notice, that default having been made in the payment of royalty or rent, and also in furnishing reports of iron ore mined, as provided by the terms of the lease under which you hold the west half of the

south-west quarter of section number ten (10), in township number forty-seven (47) north, of range number forty-five (45) west, in the State of Michigan, of which we are the owners in fee, and you, the tenant under us, are hereby required to surrender to us the immediate possession of said described premises, or proceedings will be instituted according to the statute in such case made and provided.

"Yours,

"E. S. Corliss.
"Richard Guenther.
"George M. Wakefield.
"Edward Ascherman,
"By Arthur P. Ascherman."

H. S. Benjamin, the secretary of the defendant company, upon whom the notice was served, says:

"Mr. Wakefield came in, and said to me, he had some notices that he wanted to serve; that I need not feel concerned about them; that he wanted to serve them so that nothing could come in ahead of them; that he would let me know before immediate action was taken. I said that I did not want to have any summary service dealt out, that I didn't have any warning of. He said there would be nothing of that kind done; that the notices were served simply to protect themselves, and before any action was taken he would let me hear from them."

Benjamin Weil says:

"I called on Mr. Wakefield at his home on the evening of November 18. He said he didn't intend to injure anybody, and all he wanted was the royalty, and to see the labor claims paid; and I said, 'I will raise the money and pay it;' and I arranged for an interview the next morning, at his office, for the purpose of arranging for the payment of the royalties. I called the next morning at 9 o'clock at his office. He said that there was no desire to injure the stockholders, or take any undue advantage of them; that he wanted his royalties paid, and, if that was accomplished, it would be all right, but that it was then too late to negotiate; that he could not do anything until he heard from Mr. Fink."

H. D. Smith says:

"I called at Wakefield's office on Friday, November 18, to talk over the situation of Sunday Lake property. Mr. Bates came in. After some talk Wakefield said he had no claims except royalty; that when that was paid he had nothing more to do. Mr. Bates asked him how soon it must be paid. Wakefield said he had served notice on the 5th, and that he would take possession three days after the decision of the justice, if it was not paid before. Mr. Bates said he would see that it was paid at once."

Francis A. Bates says:

"On Friday, November 18, I called at Mr. Wakefield's office. I told Mr. Wakefield that I had heard some rumors about his commencing suit against the mine for royalty. He told me he had done so, and that Mr. Fink was up there (Wakefield) at that time. I told him I knew nothing about legal matters in this connection, and asked him if he could tell me what it was necessary to do. He said, in the first place, that he wanted his royalty, but that judgment could not be given until the following Tuesday, and that, if the royalty was paid on Monday, it would be all right. He said that that was all he had against the property; that he wanted to get his royalty paid, and that was all the claim he had. He said there were other claims due the men that ought to be paid up. I told him we were making every effort to pay them, and had made a contract with Mr. Smith for ore, and arranged to push the mine, and had arranged to pay promptly from that time on. He said he wanted the royalty paid, and that was the only claim he made."

G. M. Wakefield, one of the complainants, denies the statements made by Benjamin, Weil, Smith, and Bates, but says:

"I think I remarked that the law allowed them seven days after service of the notice to pay the royalties. I understood that Mr. Smith and Mr. Pecans held some of the defendant's stock as collateral; and at my request Mr. Fink, on November 13, sent a dispatch to Mr. Smith, asking him if he would protect the property, and pay the royalties; and, when I found that Smith would not pay, I determined to take possession."

Referring to a conversation with Bates on November 19, he says:

"Bates asked me what form we had got to go through to take possession of the property, and I told him what had been told me by Mr. Ordway, and what Mr. Fink had told me Messrs. Ball & Hanscom had told him, namely, that a notice must be served, and, if not paid within seven days, we could take possession if we could get it peacefully; if not, suit would have to be brought in the county where the mine was located. He asked me that question over as many as two or three times, till I became a little perplexed about it, and I said to him: 'You had better counsel your own attorneys. I don't propose to run both sides of this case.' He then says: 'Mr. Wakefield, if you had been paid your royalties, you would have been satisfied?' 'Yes, sir,' I says, 'if we had been paid our royalties, this suit would not have been commenced.'"

He states that he served notice upon Benjamin, and said to him that—

"I had come to demand my royalties for the last time, and to serve papers on him; that we should take possession if they were not paid."

Nothing was done under the notice until November 18, when Fink, representing complainants, appeared before a justice, made complaint for the recovery of possession, and a summons was issued and placed in the hands of a deputy-sheriff. McVichie, the superintendent, was at the mine. On the 19th, Fink, his attorney, and Sullivan, the deputy-sheriff, go to the locality of the mine, and meet McVichie. Sullivan serves the summons upon him, and what follows is told by Fink.

"I stated to him that I had come out to demand possession of the mines. I pulled out the lease, and read it to him; and McVichie said he didn't see how he could prevent me from taking possession. McVichie said that the men had not been paid, and I said that I would see them paid. He said that he had guaranteed certain claims, and I agreed to see them paid. Then we walked

up to the office, and he invited me to dinner with him. When I got to the office, I told the captain that I had peaceable possession of these two properties, and asked him if he wanted to continue superintending them on our account, and he assented, and then, in the presence of McVichie, I placed Sullivan, the deputy-sheriff, in charge. While we were talking, a telephone message came, and McVichie answered it, and turned around to me, and said: 'If there is anything yet to be done, you had better do it right away, as there is going to be trouble.' "

McVichie was in defendant's employ at a salary of $2,000 per year. He had been at Milwaukee between the 10th and 15th of November. He had had, while there, an interview with Mr. Wakefield. On November 17 he wrote the following letter to Wakefield:

"GEORGE M. WAKEFIELD,
                    "Milwaukee, Wis.

"*Dear Sir:* I have been notified to-day that unless the labor claims were settled before the 22d I would have trouble. The merchants in Wakefield that went on the bonds to appeal the suits for labor claims say they have been grossly deceived by Mr. Bates in the security he gave them for going on the bonds. The security was money due the mines from Dalliba, Hussey & Co., for ore sales, which he represented to be $13,000. Mr. Murray, of the Bank of Wakefield, who was appointed trustee to look after the security, has inquired into the matter, and finds that there is no such amount due or likely to be until more ore is shipped.

                                    "D. McVICHIE.
"P. S. You will please keep this information quiet, and act as you think best."

It appears that his employment by complainants was at an advanced salary. McVichie, however, called for complainants, gives his version of the matter:

"He (Fink) demanded possession of me, and I asked him on what grounds, and he read the lease to me, and I answered him that I didn't see how I could keep him from taking possession on those grounds. He said to Mr. Murray, who was cashier of the bank, and who was pres-

ent: 'We don't want to beat anybody. If the stockholders will come up and pay the royalties and the labor debt, and guarantee to go on with the work, they can have their property.' * * * I. was put out of the office on the 29th,—myself and my book-keeper. * * * On the morning of the 29th, myself and Mr. Heath went out to the mine,—we were boarding in town at this time,—and after going around the mine a little while, I went up to the office. I walked into the office, and was asked by Mr. Ellsworth whom I represented there, and I said the Sunday Lake Mining Company, or Moore, Benjamin & Co.,—I am not sure as to which; and he said we couldn't stay there; and I answered him that I guessed we could; and I took off my coat and sat at the desk; and I presume we were there half an hour. The sheriff asked me to get out, and I said, 'No,' and then he finally put Mr. Heath out, and then Mr. Byrnes came over, and one took hold of each arm, and I went out. There was no struggle or anything. * * * That occurred the day after Thanksgiving, I think. * * * As I told you in my evidence before when you asked me who I considered I was working for, I. told you I supposed the whole thing would be settled satisfactorily; and it didn't occur to me for one moment that the Sunday Lake Mining Company was going to lose the property * * * When Mr. Fink demanded this possession of me, we made those terms that I have specified. * * * As near as I can remember, upon his demanding possession, and reading the lease to me, my answer was that under those circumstances I couldn't see how I could resist; and I said more than that, but I am not sure of it. I think I said that I didn't want to do anything that was wrong in the matter. He said that it was not their purpose to beat anybody; that if those fellows would come up with the money, and pay the labor debt, and the royalties, and guarantee to go on with the work, they would have their mine."

B. Weil says:

"I saw Mr. Fink on the 20th. He stated that there was no intention of doing anybody any injury; that all they wanted was to see that the royalties were paid, and that the laboring men received what was coming to them. He gave me to understand that neither the stockholders, bondholders, nor any one else interested would suffer if

the royalties were paid and the laboring men satisfied. I talked with M. M. Riley, a lawyer employed by Mr. Fink, and he said if everything was paid up there would be no trouble. I first learned that they intended holding the property, and insist upon a forfeiture, when Turner showed me Riley's telegram (November 27th).    *    *    * I asked Fink what he was doing there. He said, 'I am here in possession of the mine.' I says, 'In possession of the mine? What do you mean?' He says, 'Why I am here in possession of the property.' I says, 'Do you mean to say you are going to hold the property?' He says: 'No, if you fix up the royalties, and pay the laboring men what is due them. That is all we want, and you can have the property any time after that has been paid. That is all we are here for,—is to see that no damage is done to the property.'"

It was understood between Mr. Ellsworth and Mr. Morgan that both the parties should remain in possession of the premises. Turner says:

"Both parties were there claiming possession,—Riley and Ellsworth for complainants. Finally Riley said: 'I will tell you what we will do. There shall be no move made by either side, and neither shall disturb the other, without giving 12 hours' notice.' I said that was satisfactory to me. On Sunday night, after I got to bed, I got the following telegram from Riley: 'Fink will take possession of Sunday Lake to-morrow morning at 8.
                              "'M. M. RILEY.'"

A breach of condition is not denied, but the lease does not provide that in the event of a breach it shall become void. The failure to pay the royalties did not, therefore, *ipso facto,* work a forfeiture. *Dare v. Boylston,* 6 Fed. Rep. 493; *White v. Lee,* 5 Ban. & A. 572; *Cheney v. Bonnell,* 58 Ill. 268. In *Palmer v. Ford,* 70 Ill. 369, the statement that "unless the rents were paid he would have to declare a forfeiture," was held to be insufficient as a declaration of forfeiture.

Under this lease the default established the right to re-enter, and the determination of the lease followed the

re-entry. But whether or not a declaration of intent to re-enter was necessary, the right to re-enter might be waived or deferred by any act extending the time within which payment might be made. A notice to quit was given, but that notice was qualified by the assurance that no further proceedings would be taken without further notice. No further notice was given until the service of the summons, November 19. In the meantime, and up to and on the very day upon which the summons was served, the complainants continued to assure defendant that complainants intended a re-entry, if at all, by virtue of the statutory proceedings, and that defendant had all the time allowed by the statute within which to pay the royalties. Had the statute been followed strictly, defendant could have paid at any time before November 21, and retained possession; and, had the proceedings under the summons been followed, defendant would have been in time had it paid by the 25th. On the very day that Fink was taking out process in Michigan, Wakefield was assuring defendant at Milwaukee that it yet had time until after judgment.

These assurances were equivalent to extensions of time, as against any other proceedings except those which defendant had been led to believe would be resorted to. The complainants had, in other words, given notice to defendant of their election to pursue a remedy under and by virtue of which defendant could not be ousted until five days after judgment, and in connection therewith had given repeated assurances that defendant had all the time which the statute gave. The defendant was making strenuous efforts to relieve itself not only of this indebtedness, but of other demands. It had appealed to its stockholders, and had finally determined upon an issue of bonds for an amount sufficient to liquidate its entire indebtedness, and some of its creditors had already signi-

fied their willingness to accept these bonds in lieu of their claims. Of these efforts complainants had been fully advised. On the 18th the president had assured Mr. Wakefield that the royalties would be paid at once, and a meeting was arranged for the next day for that purpose; but on the 19th Mr. Wakefield informed defendant that it was too late; and, at the very time when Fink was perfecting his re-entry, defendant's officers, with more than sufficient money in hand to pay the royalties, were seeking Mr. Wakefield in his usual haunts, for the purpose of paying the amount due; but, not finding him, at 2 o'clock, within two hours and a half after Fink's claimed re-entry, the sum of $5,000, more than sufficient to pay all the royalty then due, was paid into the bank fixed by the lease as the place of payment. Under these circumstances, a re-entry was premature and clearly unauthorized. But, independent of these considerations, the re-entry in the present case, and possession following it, is not such a re-entry and possession as will authorize a court of equity either to declare a forfeiture or to proceed as if one had been incurred.

A party cannot found a possession entitled to recognition by a court of equity upon an entry made by collusion with the servant of the actual occupant, nor can a possession necessary to support a bill to quiet title be predicated upon an entry secured by misrepresentation as to its purpose. In equity, the entry must not only be quiet and peaceable, but it must be honest, and not one secured by fraud, stealth, or misrepresentation. Equity will not fortify an advantage obtained by a trick. *Farmer v. Hunter*, 45 Mich. 337; *Newton v. Doyle*, 38 Id. 645; *Watson v. Brewing Co.*, 61 Id. 595.

McVichie was the servant of defendant. He had had at least one interview with Wakefield. He had written at least one confidential letter to Wakefield. It nowhere

appears that on the 19th, when possession was demanded of him by Fink, he asked for time to consult his employers, or that he at that time or at any subsequent time notified his employers of what was being done or attempted, or of what had been done; but, on the contrary, he submits to Fink's demand, and, when a telephone message comes to the office, he informs Fink that there is going to be war, and, if anything further is necessary on Fink's part to fortify himself, it had better be done at once. Under such circumstances, it is difficult to avoid the conclusion that Fink's re-entry was collusive. McVichie, however, explains that Fink represented to him that the entry was to protect all parties, and that as soon as the royalties were paid, and the men satisfied, the possession would be surrendered. The fact that Fink made the same representations to others gives color to McVichie's story. Acting upon these representations made by Fink, the defendant's officers proceed to satisfy the labor claims, and several thousand dollars were paid out for this purpose. A question then arising as to possession, complainants, on November 29, forcibly eject all persons claiming to be there representing defendant. At the time of this eviction the royalties had been paid, and the labor claims had been satisfied, and defendant had complied with all the requirements insisted upon by complainants, and was equitably entitled to possession.

But it is claimed that defendant has violated the condition of the lease respecting the cutting of timber upon the lands in question. This, however, is not one of the acts or neglects for which a forfeiture may be declared, or a re-entry may be made, under the lease. The provisions regarding forfeiture will be strictly construed. The lease provides that—

"If it shall so happen that the royalty or rent above reserved and agreed to be paid be behind or unpaid at

the time or on the days above mentioned for the payment thereof, or in case said taxes or assessments are not paid in due and timely season, *or in case of the non-performance* of any of the covenants made by said parties of the second part *at any of the times mentioned for the performance thereof,*"—

Then a re-entry may be made. Mr. Wakefield, when asked regarding the cutting of timber, replied:

"I should expect that, if the tenant kept a lease, the life of the lease specifies twenty or twenty-five years, he would remove every stick of it, and a great deal more."

The life of the lease is thirty years, and it was not strange that the parties were satisfied that this covenant should rest in contract alone, without the additional security of right of forfeiture.

Again, it is said that defendant is insolvent. To establish this claim it is shown that several suits had been commenced by attachment against defendant. But two of them, however, were commenced before complainants entered upon the mine property. One of these was upon a claim of $100, and the other for an injury received by one of the workmen in the mine. The assets of the company were principally in the plant and leasehold interest. Naturally, with complainants in possession, claiming that upon a forfeiture and re-entry the plant and leasehold interest were likewise forfeited and became their property, the defendant company would be regarded as insolvent. Statements sent out to stockholders are produced, in which it is set forth that their liabilities are in excess of their assets some $32,000; yet their liabilities are largely to their own stockholders, and only available assets are named. Complainants concede the plant and leasehold interest to be worth $50,000, and several witnesses produced by defendant give the value at from $100,000 to $200,000, and these assets are not included in the statement exhibited.

I am clearly of opinion that the assurance given to the secretary of defendant company by complainant Wakefield, at the time of the service of the notice on November 5, to wit, that another notice would be given, deferred the right of entry until such other notice should be given; that the subsequent assurances given to defendant's officers as to the time within which the royalty might be paid under the statute further deferred the right of re-entry until such time should elapse, or notice of the abandonment of those proceedings should be given; that the giving of this notice and of the assurances subsequent thereto was notice to defendant of complainants' election to proceed to the recovery of possession under the statute, and there could be no re-entry unless by the abandonment of said proceedings and notice thereof, except pursuant to the statute; that the re-entry by Fink, with the assurance that possession would be surrendered upon payment of the royalties, did not operate as a determination of the lease, but was in a recognition of its continuance; that, the royalties having been paid in full, and all claims made by complainants met, the continuance of possession thereafter by complainants was against the just rights of defendant.

The defendant is therefore entitled to be restored to possession of said mine and mining plant at once, and the complainants must account to defendant for all property of the defendant, or connected with said mine, coming into their possession, or taken possession of by them; and they must also account for all ore taken from said mine by them at the market value of the same when taken, less the royalty to which they were entitled under the lease.

The complainants will be entitled to offset the actual cost of operating said mine since they took possession,

together with the actual costs of the permanent improvements made upon the mine, which are not included in the costs of operating as aforesaid, and also to offset all moneys actually paid out by complainants for labor claims due by defendant, and existing on the 19th day of November, 1887. In such accounting complainants will not be entitled to any moneys paid out for or in connection with this litigation, or to officers other than the superintendents and necessary clerical assistants at the mine. The complainants in said accounting will be charged with the sum of $5,000, deposited by defendant in the Union National Bank at Oshkosh, and credited with any sum or sums which shall be found to have been due from defendant as royalty on the 19th day of December, 1887, but without interest. After such accounting, and within 30 days after the final decree herein, the balance found to be due upon said accounting shall be paid over to the party to whom the same shall be found to be due and owing.

The decree below is therefore reversed, with costs of both courts, as well those already incurred as those upon the accounting, to defendant, and the record will be remanded, a decree entered at once restoring defendant to possession, and further proceedings had in accordance with this opinion.

Morse and Long, JJ., concurred with McGrath, J.

Champlin, C. J. I am of the opinion that the decree appealed from should be affirmed, for the reason that, after a careful reading of the whole record, I am satisfied from the testimony that the forfeiture and termination of the lease were complete, and the entry and taking exclusive possession by complainants were accomplished facts, and were justified.

Grant, J., concurred with Champlin, C. J.