AMMENDALE NORMAL INSTITUTE, INC. *v.*
SCHROM CONSTRUCTION, INC., ET AL.

[No. 184, September Term, 1971.]

*Decided March 6, 1972.*

The cause was argued before HAMMOND, C. J., and
BARNES, MCWILLIAMS, FINAN, SMITH and DIGGES, JJ.

*Ralph F. Berlow* for appellant.

*James D. Newton* for appellees.

SMITH, J., delivered the opinion of the Court.

A property owner here complains because a party was
permitted to continue to remove sand and gravel from

the owner's property after bringing to date royalty payments which had been in arrears. We conclude that the chancellor properly denied injunctive relief, but gave the wrong reasons for that denial.

Appellant, Ammendale Normal Institute, Inc. (Ammendale), a religious facility conducted by the "Christian Brothers," entered into a written agreement in 1963 with appellee, Schrom Construction, Inc. (Schrom), under which Schrom was "to mine sand and/or gravel" from the land of Ammendale, paying certain specified sums per ton. The agreement provided "this ground for mining and processing materials may be available for approximately ten years or until sold." The method of measurement was set forth. Payment was to "be on a monthly basis by the fifteenth of each month for all materials sold." It provided "[u]pon completion of the mining or processing areas, Schrom [would] level all ground disturbed in a workmanship like manner so that it [would] have a gradual contour and [would] not impound water and have proper drainage." It is silent as to any remedy in the event of default on the part of Schrom.

In May of 1969 Ammendale filed a bill of complaint reciting its ownership of property upon which were "located certain valuable deposits of sand and gravel"; that Schrom was in the business of excavating and processing sand and gravel; that Ammendale had permitted Schrom "to remove sand and gravel from certain areas under an informal memorandum"; that "[c]ontrary to the directions of [Ammendale], [Schrom] ha[d] invaded other areas forbidden by [Ammendale] and ha[d] been removing sand and gravel from [Ammendale's] property against the direction and wishes of [Ammendale]" although Ammendale had "repeatedly notified [Schrom] of the termination of his permission to mine the sand and gravel and to desist from invading the forbidden area of [Ammendale's] land"; that Ammendale had ordered Schrom to remove its equipment and cease operations but Schrom continued to come upon Ammendale's land; and that the conduct of Schrom "and its contin-

uation ha[d] in the past and [would] continue to cause [Ammendale] immediate substantial and irreparable damage unless [Schrom was] enjoined from doing so." The prayer for relief was in the following form:

"1. That each of the defendants be enjoined *pendente lite* and permanently from going upon the plaintiff's property located at Ammendale Road, Beltsville, Maryland, and from removing sand and gravel therefrom.

"2. That an *ex parte* injunction be granted immediately prohibiting, enjoining and restraining the defendants from going upon the plaintiff's real estate located at Ammendale Road, Beltsville, Maryland, and removing any sand and gravel therefrom and that the requirement of bond pursuant to Maryland Rule BB75 be dispensed with, because it will constitute an extraordinary hardship for the plaintiff.

"3. That an Order to Show Cause be issued directing each of the defendants to show cause, if any they may have, why the Court should not grant the Plaintiff an injunction *pendente lite,* to enjoin the defendants from going on the land of the plaintiff located at Ammendale Road, Beltsville, Maryland and removing sand and gravel therefrom.

"4. That the defendants give a full and complete accounting to the plaintiff of the sand and gravel removed by the defendants and the plaintiff have judgment in such amount as may be found due.

"5. And for such other and further relief as the case may require."

An *ex parte* injunction was issued.

Subsequently, Ammendale moved for summary judgment. The affidavit in connection with the motion included in it a statement that on July 17, 1970, Ammendale received a payment accompanied by a statement

setting forth the materials Schrom admitted removing during the month of April, 1970, but Schrom had "failed and refused to make any payments to [Ammendale] for any months thereafter," although Schrom had been removing materials and was "in arrears on the payments for the months of May, June, July, August, September, and October."

The motion for summary judgment was heard by Judge Loveless on January 14, 1971. He passed an order enjoining Schrom from going on Ammendale's property, and removing sand and gravel until Schrom accounted with Ammendale "for all arrearages from April of 1970 for sand and gravel removed * * * from the premises." He stated he was unwilling at that time to hold that the circumstances were such as to effect the termination of the entire contract. Accordingly, he denied "the balance of the motion for summary judgment."

The matter ultimately came on for hearing before Judge Loveless. Apparently, the Schrom operations had been centered in the area known by the parties as "Chicken House Hill." At the hearing before Judge Loveless it was brought out that Schrom claimed that it had an exclusive right to mine on Ammendale's property and that this right extended to almost all of the Ammendale land, not being strictly limited to the "Chicken House Hill" vicinity. At the same time Ammendale alleged that the "Chicken House" area was designated by it as the primary site of operation and that this was understood by the parties at the time of the contract, but that it was further understood that mining rights could be extended to Schrom for other areas at the discretion of Ammendale. Judge Loveless in his opinion commented on the fact that Ammendale's chief dissatisfaction was that payments were consistently late, that some payments were several months in arrears, that two checks were returned marked "Insufficient Funds," and that after this the bill of complaint was filed. He further said:

"The issues before the Court are several. First, should an injunction issue to stop

Schrom's mining operations on the Institute's property at Beltsville? Secondly, does Schrom have an exclusive right to mine the property? Third, has there been an effective modification of the contract such that Schrom is entitled to make payments at times later than on the 15th of each month as specified by the contract? Fourth, does Schrom have an enforceable claim against Contee and the Institute for damages?"

All of these questions were answered in the negative. The bill for injunction was denied. Schrom was directed to "pay promptly by the 15th of each month as provided by the contract for all sand and gravel materials removed from [Ammendale's] property," and the contract was construed as not giving Schrom exclusive mining rights. The third paragraph of the resulting order read in part:

"[T]hat Schrom C o n s t r u c t i o n, fully and promptly comply with the requirements of the Prince George's County Zoning Ordinance."

No appeal was entered from that decree.

This cause reaches us as a result of a petition filed in the same proceeding just over two months after passage of the decree. That petition recited the terms of the decree; that checks dated February 19, 1971, and March 12, 1971, for sand and gravel removed during the months of January and February, 1971, had been returned by the bank upon which they were drawn because they exceeded the sum on deposit by Schrom in the bank; that in April in another case in Prince George's County Schrom had obtained leave to intervene without advising the court of that portion of Judge Loveless' decree that required Schrom to "fully and promptly comply with the requirements of the Prince George's County zoning ordinance"; that Schrom had not complied with any of the ordinance requirements of Prince George's County; that by obtaining this order granting permission to intervene it had attempted to avoid compliance; and that Schrom

was continuing to remove sand and gravel although it had failed to make any payments to Ammendale or otherwise comply with the decree of March 10, 1971. (The other Prince George's County proceeding to which reference was made was one that sought a declaratory judgment that a certain portion of the Prince George's County zoning ordinance relative to mining sand and gravel was unconstitutional.) The petition prayed that Schrom be held in contempt.

At the hearing it was admitted that payments were not in fact made on time. The chancellor, Judge Meloy, said:

> "It would appear from the petition to adjudicate the defendant in contempt of the order that payments for materials mined during the months of March and April, 1971, were not paid for on time. It has been admitted by the defendant that the payments were not paid for on time, and that sometime subsequent to the due date, respectively the 15th of each month, there was mailed to the plaintiff, arriving on or about the 2nd of June, 1971, payments for March and April mining operations.
>
> * * *
>
> "* * * The Court is of the opinion that when the plaintiff received and accepted the moneys due subsequent to their date that they were in effect condoning the illicit delaying, dilatory action of the defendant, and in effect acquiescing in the breach.
>
> * * *
>
> "I draw to the petitioner's attention that the right to an injunction is never absolute, but it rests in the sound discretion of the Court. An injunction is primarily a preventative remedy, the province of which is to afford relief against future acts which are against equity and good conscience, and to keep a condition in status

quo, rather than to remedy something which is past or to punish for wrongful acts already committed.

"Under the Court's philosophy with respect to injunctive relief, the Court will not in this instance grant injunctive relief. We will find as a matter of equity that the defendant was technically in contempt by noncompliance with the date of payment, and will rule under the circumstances of this case at this time and in view of the evidence that the contempt has been purged, but will strongly admonish the defendant to comply with the order of March the 10th hereinbefore signed by Judge Loveless."

The order passed by the chancellor as a result of the hearing found Schrom in contempt of the earlier decree, held that he "ha[d] purged himself of said contempt by telephonic condonation and by acceptance on behalf of [Ammendale] on or about the 2nd of June, 1971, of checks in payment of the current account due," found that "[o]ther allegations of willful violation of the Court's order of March 10, 1971 * * * were not pursued by [Ammendale]," and "denie[d] the prayer for enjoinment and injunctive relief on the ground that to grant such a drastic remedy in this case, amounting to a complete rescission of the contract, would be punitive and repressive for inadvertence already committed (untimely payments of amounts due)."

On appeal to us Ammendale urges that the trial court erred in refusing to enjoin the further removal of sand and gravel "after the contract ha[d] been terminated by [Ammendale]." Ammendale does not point to any affirmative action on its part to terminate the contract, but claims the failure to make payment as required was a breach of contract justifying termination, citing as its authority *McGrath v. Gegner,* 77 Md. 331, 26 A. 502 (1893), involving a contract to buy oysters and the failure to pay in accordance with the contract, and *Balti-*

*more City v. Schaub Bros.*, 96 Md. 534, 54 A. 106 (1903), involving sale of coal and the right to terminate for non-payment. We regard neither case as applicable here.

Although couched in the form of a prayer for injunctive relief, what Ammendale actually seeks amounts to a declaration that Schrom has forfeited the right granted to it. The chancellor in effect held the right of forfeiture waived by virtue of the payment on June 2 of the sums due on April 15 and May 15. It is to be noted that the chancellor's order was passed on June 14, one day prior to the time when the next payment would have been due. In a landlord-tenant situation our predecessors in *Morrison v. Smith,* 90 Md. 76, 44 A. 1031 (1899), said:

> "[The demurrer], in terms, conceded a forfeiture had been incurred by the plaintiff in the nonpayment of the October instalment of rent, but sought to obviate such effect and revive the lease, on the principle of waiver, by alleging the bare subsequent payment by him *and the receipt of said rent by the lessor, of the very rent, the non-payment of which had occasioned the forfeiture.* 'The receipt of rent after a breach of covenant does not operate as a waiver unless the rent received accrued subsequently to the act which works the forfeiture.' *Bleeker v. Smith,* 13 Wend. 530; *Williams v. Vanderbilt,* 21 L.R.A. 489; 12 *Am. and Eng. Ency. of Law* (1st ed.) 758 *n.* 'The ordinary *waiver of forfeiture* occurs by an acceptance of rent *which became due after a breach committed by the tenant.'* Section 497, *Taylor's Landlord and Tenant* (7th ed.). This seems to be the well recognized rule of law on the subject settled by the great weight of authorities, if not by all." *Id.* at 82-83. (Emphasis in original.)

Accordingly, it follows that the acceptance of the April 15 and May 15 payments on June 2 did not constitute a waiver of any right of forfeiture.

The Maryland aversion to forfeiture of a business lease was discussed recently in *Dreisonstok v. Dworman Bldg. Corp.,* 264 Md. 50, 284 A. 2d 400 (1971). Indeed, in *Evergreen Corp. v. Pacheo,* 218 Md. 230, 233, 145 A. 2d 774 (1958), Judge (now Chief Judge) Hammond had occasion to point out for the Court, although declining to apply it upon the facts of that particular case, "that equity will relieve against the forfeiture of a lease occasioned by the nonpayment of rent if there is a tender of all that is due and owing," citing *Wylie v. Kirby,* 115 Md. 282, 286, 80 A. 962 (1911).

Code (1957, 1969 Repl. Vol.) Art. 75, § 27 provides "as often as it shall happen that one-half year's rent shall be in arrear" a landlord may maintain an action in ejectment if he reserved a right of re-entry in his lease. This statute is "a re-enactment in substance of the 2nd section of 4 Geo. II, ch. 28, which, up to [the time of enactment of Chapter 346 of the Acts of 1872] had been in force in this State." *Campbell v. Shipley,* 41 Md. 81, 93 (1874). Even then, § 4 of the statute of 4 George II, Chapter 28, remained in force in Maryland.[1] *Chesapeake Realty Co. v. Patterson,* 138 Md. 244, 113 A. 725 (1921). That section was quoted by the Court as stating:

> " 'If the tenant or tenants, his, her or their assignee or assignees, do or shall, at any time before the trial in such ejectment, pay or tender to the lessor or landlord, his executors or administrators, or his, her or their attorney in that cause, or pay into the court where the same cause is depending, all the rent and arrears, together with the costs, then, and in such case, all further proceedings on the said ejectment shall cease and be discontinued.' " *Id.* at 248.

*See also Streeter v. Middlemas,* 240 Md. 169, 174, 213 A. 2d 471 (1965). 2 *Poe, Pleading and Practice* § 495 (5th ed. Tiffany 1925) states:

---

1. The statute of 4 George II, Chapter 28, is one of those repealed by Chapter 649 of the Acts of 1971. No replacement for § 4 appears to have been provided.

"Where, however, the lease contains no such express covenant, the case is different, and in order to work a forfeiture of the title of the tenant under his lease, by reason of non-payment of the rent, so as to enable the landlord to maintain ejectment, the strict rule of the common law must be complied with. This rule requires that the precise sum due must be demanded at a convenient time before sunset on the day when the rent is due, in the most notorious part of the demised premises. Hence, where the rent was demanded at half past ten o'clock in the morning of the day on which it was due, it was held that the demand was insufficient, and that consequently the tenant's title was not forfeited; and so, where the proof showed that the demand was made *on the afternoon* of the last day, it was held insufficient; but all the authorities show that when the demand is made at the proper time and place, and the lessor thus elects to avoid the defeasible title of the lessee, and makes an entry on the land for the purpose, he may bring ejectment to recover the possession, and, upon proof of these facts, may recover." (Emphasis in original.)

An aversion to forfeitures is not peculiar to Maryland. *See* 3A *Thompson on Real Property* § 1337 (1959 Repl. Grimes) at 608. Citing *Worthington v. Moon,* 53 N. J. Eq. 46, 30 A. 251 (1894), and *Coe v. Columbus, P. and I.R.R.,* 10 Ohio St. 372, 75 Am. Dec. 518 (1860), 2 *Pomeroy's Equity Jurisprudence* § 459 (5th ed. Symons 1941) states:

"And equity will not indirectly enforce a forfeiture by granting an injunction." *Id.* at 317.

Here, we do not have a sale of goods as in *McGrath v. Gegner* and *Baltimore City v. Schaub Bros.,* both *supra,* relied upon by Ammendale, nor a lease, but a license to ex-

tract certain materials from the ground, a profit à prendre. *See* 25 Am. Jur. 2d *Easements and Licenses* § 4 (1966) ; 28 C.J.S. *Easements* § 3 f (1941) ; 1A *Summers, The Law of Oil and Gas* § 154 (1954) ; 2 *Tiffany, Real Property* § 381 (2nd ed. 1920) ; 1 *Tiffany, Landlord and Tenant* § 7, at 30 (1910) ; *Beckwith v. Rossi,* 157 Me. 532, 175 A. 2d 732 (1961) ; *Wenger v. Clay Tp.,* 61 Ind. App. 640, 112 N. E. 402 (1916) ; and *Hopper v. Herring,* 75 N.J.L. 212, 67 A. 714 (1907).

Technically, the overdue payments here were not rent, but royalty. Failure to make due payment of the royalties reserved in a mining lease will not, "in and of itself, work a forfeiture when the lease does not provide that it shall become void in the event of nonpayment." *Thompson op. cit.* § 1335, at 598, citing *Dare v. Boylston,* 6 Fed. 493 (C.C.S.D.N.Y. 1880), and *Wakefield v. Mining Co.,* 85 Mich. 605, 49 N. W. 135 (1891). Relative to oil and gas leases 3A *Summers, op. cit.* § 616 (1958) states:

> "Oil and gas leases ordinarily do not contain an express provision empowering the lessor or royalty owner to declare a forfeiture thereof for the nonpayment of gas well rentals or oil and gas royalties from production. In the absence of such a provision the courts in most jurisdictions refuse to enforce a forfeiture for the nonpayment of royalties by decreeing a cancellation of the lease."

To the same effect *see* 3 *Kunz, Law of Oil & Gas* § 44.4 (c) (1967). *Coal Company v. Combs,* 204 Va. 561, 132 S.E.2d 399 (1963), is a more recent holding that in the absence of an express forfeiture provision the breach of a covenant to pay royalty does not work a forfeiture and even express provisions are usually considered to be for the benefit of the lessor and may be waived by him.

Citing *Cover v. Taliaferro,* 142 Md. 586, 122 A. 2 (1923), 2 *Pomeroy, op. cit.* § 459 states:

> "It is a well-settled and familiar doctrine that a court of equity will not interfere on behalf

of the party entitled thereto, and enforce a forfeiture, but will leave him to his legal remedies, if any, even though the case might be one in which no equitable relief would be given to the defaulting party against the forfeiture." *Id.* at 314.

In the latter case Judge Offutt said for the Court:

"While it may be going too far to say that a forfeiture will under no circumstances be enforced in a court of equity, it is nevertheless true that a court of equity will not lend its aid to divest an interest or an estate by enforcing a forfeiture except with extreme reluctance and only in the most extreme cases, and the general rule is that courts of equity will not aid in the enforcement of a penalty or a forfeiture." *Id.* at 598-99.

We can not write the license agreement for the parties. It was up to them and their counsel to provide in the agreement as to what, if any, remedies would exist if the royalty payments were not made. Had this been a landlord-tenant relationship the landlord could not have maintained an action in ejectment unless the lease provided a right of re-entry, or provided it should be void if rent were not paid for a specified period (*see* 2 *Poe, op. cit.* § 496), or unless he complied with the common law procedure for notice. His sole remedy would be under Code (1957, 1972 Repl. Vol.) Art. 53, §§ 39N-39R. It is interesting to note that § 39P of that statute provides "that if the said tenant * * * shall * * * tender the rent found to be due and unpaid * * * the said complaint shall be entered satisfied and no further proceeding shall be had thereunder." Even in a landlord-tenant relationship with a forfeiture provision in the lease, a court of equity would have power in a proper case to relieve from a forfeiture for the nonpayment of rent upon the ground that the condition was intended as a mere security. *Wylie*

*v. Kirby, supra,* at 288 and 2 *Pomeroy, op. cit.* § 453, at 290.

Since the license agreement was silent as to the remedies available to Ammendale for violation by Schrom of the terms of the agreement, we conclude that Ammendale was not permitted to declare a forfeiture. This view is in no way altered by the fact that the decree specified the times when payment was to be made. We interpret the specification by the chancellor in the decree of the time for payment by Schrom as in the nature of construction of the agreement between the parties since there was an apparent dispute as to whether the payments were due and payable upon the basis of sales made, or upon the basis of accounts collected each month.

As we view the case, the action of the chancellor should be affirmed, not because the question of issuing an injunction was discretionary on the part of the chancellor, but because injunctive relief constituted but another form of forfeiture and forfeiture was not available to Ammendale as a remedy. This likewise disposes of the other arguments of Ammendale since they were yet other reasons for the forfeiture Ammendale desires.

*Order affirmed; appellant to*
*pay the costs.*