DE GRASSE v. VERONA MINING CO.

1. FRAUD—CONTRACTS—MISREPRESENTATIONS—DECEPTION.
   As ground for rescinding a contract for fraud, the complaining party must establish the fact that he was deceived by the fraudulent representations: unless he was ignorant of the falsity of the statements, he is not entitled to relief.

2. LANDLORD AND TENANT—MINES AND MINING—LEASE—CANCELLATION.
   Where the terms of a mining lease represented that the lessee had made certain explorations and had discovered mineral in paying quantities, and by the provisions of the lease it was stipulated that the lessee should pay a minimum royalty, but, upon making search, ore in merchantable quantities was not found, complainant lessor, who was familiar with the conditions, was not entitled to a cancellation of the contract because of alleged fraudulent misrepresentations in relation to the existence of ore, and while the recital might estop the lessee from denying that ore existed in the real property, it would not furnish a sufficient basis of rescission.

3. OPTION—LEASE—CONTRACTS.
   A written option, granting to the defendant mining company a right to a lease on condition that it would com-

mence exploratory work and continue the same until a
date named in the contract, bound the owner to deliver
a lease when the same was due, whether ore had been
discovered at such time or not, if the terms of the option
had been completely carried out by the other party
thereto.

4. MINES AND MINING—FRAUD—EXISTENCE OF MINERAL RIGHTS.

Where, under an option, the owner of property was abso-
lutely obligated to execute a lease within a year at the
election or demand of the other party, whether there was
ore on the property or not, he could not be relieved by
decreeing the cancellation of a duly executed lease of
the property pursuant to the terms of the option on the
ground that it contained a fraudulent statement repre-
senting that there was ore on the property in merchant-
able quantities.

5. SAME—TRANSFER OF RIGHTS—ASSIGNMENT.

As a general rule, complaint may be made of fraud by the
person only who relied upon the representations, and to
whom it was made, or by one who was expected and
intended to act or rely upon the statement.

6. LANDLORD AND TENANT—COVENANTS — MINES AND MINERALS—
EXPLORATIONS.

A covenant is a promise or agreement under seal to do or
not to do a particular thing, and unless the covenant to
do exploration work was contained in the lease none could
be implied so as to entitle the lessor to forfeit the agree-
ment.

7. SAME—FRAUD—REFORMATION OF INSTRUMENT—EQUITY.

A mere representation by an officer of a corporation that
defendant lessee would thoroughly explore the premises
and, if ore was found, mine it in a big way, was insuffi-
cient to warrant the implication of a covenant in the
lease that the defendant would thoroughly explore the
property and mine the same in the manner indicated.

8. SAME—COVENANTS—EXPLORATION—LEASE.

The grant of a right to mine iron and other ore upon con-
dition that all mines discovered should be opened and
worked in the usual and customary manner and made
in consideration of prompt, continuous, and full per-
formance of the covenants and conditions contained in the
contract, did not amount to a covenant to explore or

mine continuously, so that by paying the rents and royalties as they fell due the lessee retained his rights without forfeiture.

9. SAME—MINIMUM CLAUSE.

Under a lease providing for a minimum mining royalty based upon 10,000 tons of ore for any one year, the implication was that during some seasons no ore would be mined: the right of the lessee to operate or not being thereby clearly recognized.

10. SAME—IMPLIED COVENANTS—CONTRACTS.

Under 3 Comp. Laws, § 8959 (4 How. Stat. [2d Ed.] § 10821), providing that no covenants should be implied in any conveyance of real estate, no agreement to carry on exploration of the property or to mine any stated quantity of ore could be read into the agreement.

11. SAME—INTERPRETATION — REMOVAL OF ORE — CONSTRUCTION OF CONTRACT—UNCERTAINTY.

A lease is not void for uncertainty because it does not expressly confer authority to remove iron ore from the premises, where it merely provided that the ore might be mined; and where the parties had agreed in a preliminary option to execute a lease, to contain provisions authorizing the removal of ore, the lease might for such purpose be reformed in favor of the defendant, the purpose of removing the ore being clearly intended by both complainant and defendant.

12. SAME—FORFEITURE—EQUITY—PENALTY.

Any right to forfeiture possessed by the lessor must be confined to the failure of the lessee to respect the covenants and conditions expressed in the instrument, not to the nonperformance of any implied conditions or clauses. Courts do not favor forfeiture. Equity does not assist in the recovery of a penalty or forfeiture and it has for a long period been the policy of the law to restrict the effect of a clause or provision in a lease by which forfeiture is effected.

13. CONSTITUTIONAL LAW—LEASEHOLD—AGRICULTURAL LANDS.

A lease of lands occupied as a homestead and suitable for agricultural purposes for a longer period than twelve years is not void where the expressed purpose of the lease was not agriculture but mining. Constitution of 1850, Art. 8, § 12.

Appeal from Iron; Flannigan, J.   Submitted January 6, 1915.   (Docket No. 18.)   Decided April 19, 1915.

Bill by Louise De Grasse and others against the Verona Mining Company, Herbert M. Pelham, and others, for forfeiture and cancellation of a lease. From a decree for defendants, complainants appeal. Affirmed.

*Moriarty & Dwyer* and *H. R. Spencer,* for complainants.

*William P. Belden (Horace Andrews,* of counsel), for defendant Verona Mining Co.

PER CURIAM.   The opinion of the circuit judge is adopted as the opinion of this court, and the decree affirmed with costs to appellees.

"In 1884 Lorenzo A. De Grasse entered as a homestead and subsequently acquired from the United States the title in fee to the N. E. $\frac{1}{4}$ of section 7, in township 42 north, of range 34 west, in the county of Iron, Mich.

"The Verona Mining Company is a corporation now, and for many years, engaged in the business of mining iron ore.   On the 29th day of June, 1905, Mr. De Grasse gave the company an option for a mining lease on his land, to continue until July 1, 1906, on condition that the company would commence exploration thereof for iron ore on or before August 1, 1905, and keep not less than three men, or a diamond, or churn, drill, engaged therein on every working day thereafter, unless prevented by the weather, accident, or other reasonable cause, until it should abandon the option, or give written notice to Mr. De Grasse of its intention to take a lease.   The option further provided that if the company suspended such exploratory work for 10 consecutive days without adequate cause, such suspension would operate to terminate the option without notice; that the company would have the right to renew the option for an additional period of six months, if, on July 1, 1906, ore sufficient, in the

opinion of the officers of the company, to warrant taking a lease had not been discovered; that in the event a lease was demanded it should run for a term of 50 years with right in the lessee to surrender at any time upon giving the lessor 60 days' notice of its intention so to do; that such lease should provide for the payment of a royalty of 10 cents a ton on all ore mined and removed; for the payment in each year of a minimum royalty on 10,000 tons, whether that amount was mined and shipped or not, the amounts of minimum royalty so paid to be credited on ore subsequently shipped, and to provide for the occupancy by Mr. De Grasse of a certain portion of the surface of the land for homestead purposes, while such occupancy did not interfere with mining operations.

"A form of mining lease was attached and made a part of the option, and it was agreed that the lease issued under the option should follow the form of lease attached, except 'as changed and modified' by the option.

"Within the period and in the manner specified in the option the company commenced and proceeded with the exploration of the land for about nine months, when it demanded a lease, and thereafter, on June 12, 1906, the parties entered into the mining lease in question in this suit. It is not disputed but the lease which was executed, in all its essential terms, covenants, and conditions, is an exact copy of the form of lease which was attached to the option, and contains all the provisions which the option stipulated it should contain, except that the option was for a lease for mining and 'removing' iron ore, and the lease reads for 'mining' simply.

"It appears from certain deeds introduced by the complainants, that while the option and lease were signed by Louise De Grasse, she did not, at the time of their execution, have any inchoate or other interest in the land. By conveyances executed in February, 1907, and in November, 1908, the title to the land passed from Lorenzo A. De Grasse and vested in Louise Moger, now Louise De Grasse, an undivided ½; in William H. Jobe an undivided 3/32; in Michael H. Moriarty an undivided 3/32; in Herbert M. Pelham an undivided 1/16; in Annie M. Cook, an un-

divided 1/16, and in Anna E. De Grasse, an undivided 3/16.

"On or about June 12, 1912, a notice in writing signed by Lorenzo A. De Grasse, Louise De Grasse, and William H. Jobe was served on the Verona Mining Company to the effect that the lease in question had been forfeited by the company for failure to mine the property as contemplated by the terms and conditions of the lease; that they would accept no further payments of royalty under the lease, and calling upon the company to execute and deliver to them an instrument effective to remove the cloud on their title occasioned by the record of what was termed in the notice the 'forfeited' lease.

"Shortly following the service of the notice of forfeiture, Mr. and Mrs. De Grasse, Mr. Moriarty, and Mr. Jobe filed the bill of complaint, by which this suit was commenced, against the Verona Mining Company, Herbert M. Pelham, Annie M. Cook, and Anna E. De Grasse. The Verona Company answered, and the case as to it was heard on the pleadings and proofs taken in open court. The bill of complaint was taken as confessed by the other defendants.

"The contentions of the complainants are: *First,* that the lease was fraudulently obtained, and should be set aside for that reason; *second,* that it was void under section 12, art. 18, of the Constitution, as it stood at the date of the lease; *third,* that if the lease was fairly obtained, and did not contravene the Constitution, nevertheless it was forfeited through the company's failure to comply with and perform the covenants thereof, and a decree, declaring the lease void from the beginning, and, if not, terminated by forfeiture, is prayed for.

"In the vicinity of the De Grasse lands are a number of iron mines in active operation. Some of these mines were in operation years before the making of the option in question and have continued on the active list ever since. Among these are the Baltic, Caspian, and Zimmerman. The latter is located on lands adjoining on the west and has a working shaft within about 25 rods of the De Grasse property. At the date of the option the Verona Company was operating under mining leases the Baltic and the Caspian, as well as other mines and explorations, in the Iron

River and other iron districts of the Upper Peninsula of Michigan, and in Minnesota. Before and at the date of the option and lease, and for a number of years thereafter, Mr. Jobe was employed by the Verona Company as superintendent of its mining and exploratory operations in the Iron River district, with headquarters at Stambaugh, Mich. During the same period Mr. Charles E. Lawrence, with headquarters at Iron Mountain, Mich., was general superintendent, and Mr. C. H. Munger, with headquarters at Duluth, Minn., was general manager of the company.

"The explorations of the property conducted by the Verona Company, after the option was given and before the lease was demanded, consisted of four diamond drill holes. From the date of the lease until 1909 no further exploratory work was done on the property. In 1909 an exploring shaft was sunk to a depth of about 100 feet, and two drill holes were extended from the bottom of the shaft, one to the north a distance of about 425 feet, and the other to the south a distance of about 573 feet. Since the completion of the drill holes, which were projected from the bottom of the shaft, no further exploratory work has been done on the property. The exploratory work performed, both before and after the date of the lease, did not disclose the presence of a minable body of merchantable ore on the land. The ore deposit on the Zimmerman property is said to dip towards the De Grasse property, and since the suspension of the drill work on the latter property, the Verona Company claim they have been awaiting the further development of the Zimmerman property, which, they further claim, will establish whether ore exists on the De Grasse property, and, if so, the location thereof.

"From the date of the lease the Verona Company has paid all taxes levied on the land, and paid to the persons entitled all minimum royalty which became payable under the terms of the lease, up to March, 1912, inclusive, and has duly tendered to the persons entitled all minimum royalty which became payable since that date.

"It is claimed by the complainants that before the execution of the lease the company, through statements of its officers, and the recitals of the lease, represented to Mr. De Grasse that merchantable ore in

paying quantities had been discovered on the land, and if it is now concluded, as the company asserts, that merchantable ore in paying quantities had not been discovered, such representation was false and fraudulent; that Mr. De Grasse believed such representation to be true, and would not otherwise have executed the lease. The recital in the lease upon which reliance is had, in part, in support of the contention that the company made such representations, reads: 'The party of the second part, having explored the said premises, represents that there exists thereon iron ore in paying quantities.' The recital appears in the fourth paragraph of the lease.

"*Gribben* v. *Atkinson*, 64 Mich. 651 [31 N. W. 570], was an action to recover minimum royalty under the covenants of a mining lease. There was evidence tending to show, and the jury was instructed, the lessee would not be liable for the minimum royalty if they found the lessee had expended the money necessary, and done all that good mining would require to discover ore, and merchantable ore in sufficient quantity to make the mining thereof profitable did not exist on the land. The instruction was approved, the court saying:

" 'If upon diligent search and exploration, no ore was found, and none exists in or under the soil, the lessee cannot be held liable for the royalty upon such ore.'

"*Blake* v. *Lobb's Estate*, 110 Mich. 608 [68 N. W. 427], was also an action to recover unpaid rent under the covenants of a mining lease similar to the lease considered in *Gribben* v. *Atkinson, supra*, except that in the Gribben lease the payment was designated as 'royalty,' and in the Blake lease as 'rent.' In the *Blake Case* the doctrine of *Gribben* v. *Atkinson, supra*, was reaffirmed, and it was held that where the lessee had made the proper excavations, and used all reasonable effort to discover ore, and it was found that merchantable ore in sufficient quantity to make the mining thereof pay did not in fact exist on the land, the lessee was not liable, and that while the sum to be paid was called 'rent,' the agreement to pay it was based on the supposition that ore existed.

"*Blake* v. *Lobb's Estate, supra*, was decided in 1896, and it was testified that it is customary, and it

is a matter of common knowledge throughout the Michigan iron mining fields, that from that time forward it has been customary to include in iron mining leases a representation by the lessee that he has explored the land, and that ore in paying quantities exists thereon, whether at the time ore has been discovered or not, with the object of estopping the lessee from denying the existence of merchantable ore in paying quantities, whenever the existence of ore is important in establishing any right of the lessor under the lease. While, therefore, it is generally agreed that the recital is effective to estop the lessee from denying the existence of ore whenever the existence of ore is material, nevertheless, standing alone, it is entitled to but scant weight in proof of the claim that the lessor was led thereby to believe that ore in minable quantity had really been discovered.

"To entitle one to avoid a contract on the ground that he was induced to enter into it upon the faith of unwarranted representations, it is essential that he should be ignorant of the matters represented. If, before he acts, he has knowledge of the truth, and thus knows the statement is not true, it cannot be said he is deceived. 20 Cyc. p. 32. Therefore whatever effect should be given the recital above quoted, in a case where the lessor did not know the conditions, is not important here. From the testimony as a whole, and more particularly the testimony of the complainant Jobe, it fairly appears that at the time he executed the lease, Mr. De Grasse was well informed of the results of the exploratory work, and knew that iron ore in quantity and quality sufficient to warrant opening up and mining the same had not then been discovered. The exploratory work was conducted under the direct supervision of Mr. Jobe, which Mr. De Grasse, who was constantly on the ground watching the drillwork, well knew. Mr. Jobe testified:

"'Q. You had a record of the drill cores as the drills went down?

"'A. Surely.

"'Q. And Mr. De Grasse was about there as often as he could be, wasn't he?

"'A. He was there very frequently.

" 'Q. Would that quite express it—he was there pretty nearly all the time you were drilling, wasn't he?

" 'A. I very frequently saw him when I went there.

" 'Q. And you did make a record in the ordinary way of doing that, didn't you?

" 'A. Yes, sir.

" 'Q. You caused the record to be made yourself, didn't you?

" 'A. It is a part of our program of work there.

" 'Q. What I mean is you caused it to be done?

" 'A. I did.

" 'Q. In fact you had charge of it, and had it done under your direction?

" 'A. Yes, sir.

" 'Q. I put this in your hand [a blueprint showing the results of the drillwork], and ask you if that is a blueprint of the drilling that was done?

" 'A. It probably is.

" 'Q. You recognize it, don't you?

" 'A. I believe that it is; yes, sir.

" 'Q. The top part of it shows the first four holes?

" 'A. The four holes from surface.

" 'Q. And that is the record you caused to be put on there, isn't it?

" 'A. Yes.

" 'Q. And it is correct, isn't it?

" 'A. I believe it to be correct.

" 'Q. And the bottom part is the record of the exploring shaft, with the drilling that was done from that, is it not?

" 'A. I believe it to be; yes.

" 'Q. That also you caused to be made?

" 'A. Yes, sir.

" 'Q. Can you tell to refresh your memory, about how long these diamond drill holes were from the bottom of the shaft?

" 'A. I could tell only from this blueprint.

" 'Q. Can you refresh your memory and state?

" 'A. This one to the south was 573 feet.

" 'Q. And that one to the north?

" 'A. That to the north was 425 feet.

" 'Q. The statements, that is, the figures along the sides, are intended to show what it encountered, are they not?

" 'A. They are.

" 'Q. When you were working on the property, you found, did you not, that the drills in the holes you put down struck the ore formation?

" '*A*. Yes; we did.

" '*Q*. And by the formation what do you mean?

" '*A*. Well, we mean the mixed material that would carry some signs of ore, and some color that might be red and indicate a low iron content, too low to be commercially profitable.

" '*Q*. And each of these four holes struck the ore formation, did they not?

" '*A*. I am not sure as to that—three did, and possibly four, but I am not sure.

" '*Q*. At least three of them did?

" '*A*. I believe three of them did.

" '*Q*. Did they strike a minable body of ore—that is, you went through little bodies of ore, but nothing large enough to mine?

" '*A*. No.

" '*Q*. Notwithstanding, you believed, and Mr. Lawrence believed, that you were in the presence of or near by an ore body on that property, did you not?

" '*A*. Yes; we thought there was something of value there and wanted to find it, but we failed to find it in our work.

" '*Q*. You told Mr. De Grasse the truth as you went along, didn't you?

" '*A*. Always told the truth.

" '*Q*. You told him you had not struck the ore body in those drill holes?

" '*A*. I did.

" '*Q*. So that he clearly understood that from you from the beginning to the end, didn't he?

" '*A*. He understood what we were doing there.

" '*Q*. And he understood you had not been able to locate the ore body so as to be able to put down a shaft, didn't he?

" '*A*. Yes.'

"The conclusion that before the execution of the lease the officers of the company did not in fact represent the discovery, and that at the time of the execution of the lease Mr. De Grasse, notwithstanding the contrary recital of the lease, knew that merchantable ore in paying quantities had not, in fact, been discovered on the land, disposes of the claim that he was fraudulently induced to execute the lease, but, assuming the making of the representation as claimed, and the result on this branch of the case must be the same.

"Options for mining leases which expressly relieve the fee owner from the obligation to deliver the lease unless a workable mine exists, or a specified tonnage

of merchantable ore is first developed, are common, but the option we are considering is not of that class. The option here in question, also a form in common use, gave the Verona Company the right to demand and receive a mining lease at any time within one year upon the condition that it would commence within a period, and continue in a manner specified, the exploration of the property until it should demand a lease or abandon the option. The language of the option is very plain. Under it Mr. De Grasse was obliged to execute and deliver the lease on demand, whether, when such demand was made, ore was discovered or not, on the sole condition that up to the time of such demand, the company kept the option alive by commencing and continuing the required exploratory work. Whether, therefore, the company represented the discovery of ore previous to the execution of the lease, and if so, whether such representation was accurate, or the contrary, is of no consequence. It should need no citation of authority to the effect that Mr. De Grasse cannot be heard to say he was induced to execute the lease upon a misrepresentation of a certain fact, when he was bound by his contract to execute the lease, whether the fact alleged to have been represented was true or otherwise.

"The representation, whatever its character for accuracy, was made to Mr. De Grasse, and not to any other person or persons who previous to the execution of the lease had any interest in the land. As early as 1908 Mr. De Grasse parted with his title to the land, and from thenceforward he has had and now claims no rights in the land or lease which have been called to the attention of the court. As a general rule, complaint may be made of a false representation only by the person to whom it was made with intent that he should act on it, or by one to whom the party making the representation intended and expected it would be communicated (20 Cyc. p. 80), and if there is authority for the position that the grantees of Mr. De Grasse are entitled in this, or any other, proceeding to notice the means by which he was induced to execute the lease, attention has not been called thereto.

"No ore has been mined under the lease. That the exploratory work of the Verona Company has not

been carried to an extent sufficient to disclose whether a minable deposit of merchantable ore exists on the land appears by the proofs, and the main question in this case is whether the failure of the Verona Company to further explore and to mine entitled the complainants to forfeit the lease.

"The lease does not expressly provide for operation of the property. On the argument at the hearing the complainants' position was that the language of the lease, the situation of the parties, the subject-matter of the contract, and the circumstances surrounding its execution, fairly justified the implication of a covenant to explore and mine. After the statutes and Michigan decisions hereinafter cited, bearing on the right to add covenants to leases by implication, were invoked, complainants' counsel shifted to the position that by implication exploration and mining is included as a condition of the continuation of the lease. The claim of an implied obligation to explore and mine is founded on the alleged promise of the Verona Company, made through its superintendent, Mr. Jobe, that it would thoroughly explore the land, and if ore was found, mine it 'in a big way,' and on certain language of the lease. If the language of the lease to which attention is directed, and which will be noticed later, is construed as the complainants contend it should be, an implied agreement to operate, and not a condition making the continuation of the lease to depend upon operation of the property, will be the result. That the Verona Company agreed to operate is the contention. Such was the position taken by complainants' counsel on the arguments, and is adhered to in their briefs, which were subsequently filed, and where they say: 'The Verona Company by acceptance of the lease impliedly agreed it would work the mines on the premises' and 'an implied agreement that the mines on the property shall be opened with reasonable diligence and worked to a reasonable extent' is essential 'to carry out the manifest intention of the parties.' If what Mr. Jobe is alleged to have said to Mr. De Grasse is read into the lease, clearly it would amount to a promise under seal to explore and mine the property. A covenant is a promise, or agreement under seal, to do or not to do a particular thing, while the office of a condition

is, generally, to indicate the terms upon which a certain right will arise, or continue, or be defeated. The case presents no basis for a condition such as is claimed, and we are limited to the inquiry whether the lease includes by implication a covenant to explore and mine, and, if so, whether the failure of a lessee to observe a covenant found by implication entitled the lessor to exact a forfeiture of the lease, under a clause which allows a forfeiture for nonobservance of the covenants and conditions 'therein contained.'

"A 'thorough' exploration of the land would mean a complete, perfect search thereof, which would absolutely demonstrate whether it contained iron ore, and if so the exact boundaries and character of the deposit, an exploration of a scope which, it may be ventured, was never undertaken by any ordinarily prudent optionee or lessee of a Michigan mining property, and all but, if not quite, impossible of fulfillment if undertaken; and a covenant to mine 'in a big way' would, through its uncertainty, defeat itself. Realizing the futility of claiming a covenant to be measured by the promise which it is alleged Mr. Jobe made to Mr. De Grasse, taken literally, the complainants abandoned that claim and insisted on an implied obligation to explore and mine with reasonable diligence and to a reasonable extent.

"If we accept as correct the complainants' position that the language of the lease is not free from doubt or uncertainty on the question whether the lessee was obliged to explore and mine, and take into account the situation of the parties, the subject-matter of the contract, and the circumstances surrounding its execution to aid in construing the same, the result nevertheless is the conclusion that it does not contain, and that neither party understood or expected it contained, a covenant to explore or mine.

"It appears that Mr. De Grasse was anxious to option his land to the Verona Company, and to that end applied at various times to Mr. Jobe, with whom he was on close, friendly terms, and who for a time lived at the De Grasse home; that he also importuned Mr. Lawrence to take an option; that finally Mr. Lawrence presented an option upon a 10-cent royalty basis, which Mr. De Grasse declined to execute; that all subsequent negotiations relating to the option were

carried on between Mr. De Grasse and Mr. Jobe, who are substantially in accord, respecting what, of interest in the present discussion, was said by each in the course of such negotiations, which were comprised in two conferences, the first about a week following the refusal of Mr. De Grasse to sign the option presented by Mr. Lawrence, and the second a few days later. Having challenged attention to his own and the mining experience of other officials of the company, the enterprise and business connections of the company, the extent and manner of its operation of other mines in the neighborhood and elsewhere, its needs and uses for large quantities of ore of different grades, its facilities for producing, transporting, and disposing of such ore, and generally the progressiveness and aggressiveness of the company in the iron ore fields of Michigan and Minnesota, Mr. Jobe, by way of what he called 'argument' to overcome the objection of Mr. De Grasse to a 10-cent royalty said, in substance, that the company would not accept an option which specified royalty above 10 cents a ton; that he thought it would be to the advantage of Mr. De Grasse to consent to a 10 rather than to insist on a 15 cent rate, because he thought the company in dull times would operate more continuously under a 10 than it would under a 15 cent rate; that at a 10-cent rate they would not, or would not be so apt to, shut down the property; that upon receiving the option the company would explore the land 'thoroughly' and, if ore was found, 'mine it in a big way.'

"It appeared from the public records of leases which were introduced, and other evidence offered, that during many years before, at the time, and ever since the execution of the De Grasse lease, leases of iron properties in the district where the De Grasse lands are situated, and throughout the Michigan iron mining section, were of two general classes; leases which provided for the payment of taxes, a fixed annual minimum royalty, and, in addition, an express covenant to mine, usually to the capacity of the mine or market, and which are commonly known as 'maximum mining clause leases,' and leases which obligated the lessee to pay taxes and a fixed annual minimum royalty, with the privilege of mining, but without an express covenant to mine. It further appeared that

applicants for mining leases, particularly corporations desiring to provide for a future supply of ore, commonly sought leases without, while the fee owner commonly insisted the lease should contain, an express covenant to mine, and that the features most important and principally discussed in negotiations for options for mining leases are the length of the lease, the rate of royalty on ore removed, the amount of the annual minimum royalty, and whether or not the lessee shall be obligated to explore and mine.

"Mr. De Grasse occupied the land from his entry thereof as a homestead in 1884; neighbors and friends of his who owned lands adjoining and in the vicinity had given options and leases to the Verona Company, and to other corporations and persons; he lived in an atmosphere of mining, mining options, and mining leases, for many years, and it is a fair inference that he was familiar with the whole subject; that he knew some mining leases obliged the lessee to explore and mine and others did not, and that the option he was about to execute called for a lease of the latter class.

"Mr. Jobe did not say, and it will be observed Mr. De Grasse does not claim he said, the lease would obligate the company to mine in a big way, or in any way, which justifies the conclusion that Mr. De Grasse understood Mr. Jobe, not as stating what the company would be obliged by the terms of the lease to do, but what he thought, and no doubt believed, it would do. That Mr. De Grasse did not execute the option under the belief that it provided for a lease which would obligate the company to mine, and that his expectation that the property would be promptly explored and mined was based upon the conduct of the company in relation to other explorations and mines, and in reliance on Mr. Jobe personally, was voiced by himself. He testified:

"'Mr. Jobe told me the company would go to work and explore the property thoroughly and open it up, and I had known him a long time and well, and I had confidence in him, and I believed he would do what he said.'

"If anything more is wanting to establish that both Mr. De Grasse and Mr. Jobe understood the lease

185 Mich.—34.

did not contain an operating clause, and that to operate or not would be at the option of the Verona Company, it will be found in the negotiations for the option. In the course of these negotiations Mr. Jobe warned Mr. De Grasse—which warning the latter understood and appreciated so well he dropped his royalty demand from 15 to 10 cents a ton—that if the very lease we are considering was written at 15 instead of 10 cents per ton, the company probably would suspend operations whenever and as often as conditions did not suit them. It must have been plain to Mr. De Grasse that if the company would have the right to suspend operations at will° under a lease exacting a 15-cent royalty, it would have the same right, under a lease containing the same words and upon precisely the same covenants and conditions, except as to the royalty rate.

"An effort was made to show that under leases such as is under consideration, it was customary for the lessees to operate or not, as suited their convenience. Whether it was customary for lessees not to operate continuously or at all, under such leases, and whether such lessees have the right to suspend operations at will, on payment of taxes and minimum royalty, are different matters. It appeared that some such lessees worked while others did not, which proves nothing, except that some found it profitable while others found it unprofitable to operate continuously. The existence of a uniform custom or practice was not shown, but it was shown that whether the lease should or should not contain an operating clause was, and is, usually a matter of bargain, and whatever the rights of lessees under such leases may be, it was established by the proofs, and it is notorious that options and leases have been taken, and vast fortunes invested therein, upon the belief that under such leases the lessee is privileged to explore and mine, or to refrain from so doing, at will, upon payment of the annual minimum royalty and the taxes.

"Attention is called to certain features of the lease which are claimed to evidence an agreement to operate, viz.: That the lessee is granted 'the right to mine;' that the lease was granted 'on consideration of the prompt, continuous and full performance of the covenants and conditions therein contained,' and

requires 'that all mines of iron ore on the premises shall be opened, used and worked,' in the usual and customary manner.   The grant of the right to mine and the omission of words requiring operation does not indicate the inclusion of a covenant to, or a condition requiring operation, but the opposite.   The consideration for the demise as expressed therein was the payment of the rents and royalties therein provided to be paid by the lessee, and 'the prompt, continuous and full performance of the covenants and agreements therein contained.'   To give this part of the lease the meaning claimed for it, it would be as unnecessary as unwarranted to insert the word 'explorations' after 'prompt,' and word 'mining' after 'continuous.'   The words are plain and their meaning not obscure.   By payment of the rents and royalties as they fell due, and the prompt, continuous, and full performance of all other covenants—and we will add, conditions—of the lease, whatever it is concluded they were, discharges the lessee respecting the consideration.

"The clause of the lease to which attention is specially directed comprises the eighth paragraph thereof, and reads:

" 'All mines of iron ore on said premises shall be opened, used and worked in such manner as is usual and customary in successful mining operations of similar character when conducted by the proprietors themselves, and so as not to do or permit any unnecessary or unusual injury to the same, or inconvenience or hindrance in the subsequent operations of any mine or mines on said premises. Said second party expressly covenants not to remove or impair any support, timber, frame works, shafts, ditches, tramways, or approaches necessary or convenient for the use or maintenance of such mines or other property or improvements, except as hereinafter provided, and all rock, earth, and rubbish taken from said mines shall be dumped in such places as not to interfere with the convenient working of any mine or mines on said premises.'

"It may be asserted that the above quoted clause, perhaps varying slightly in phraseology, will be found in almost every mining lease of a Michigan property, and it is a matter of common knowledge that it is intended, as the words of the clause plainly indicate, not to require the lessee to open, use, and work the

mine, but to fix and settle the manner in which the lessee, whenever he undertakes to do so, shall open, use, and work the mine. The object of the clause is to prevent a waste of ore and unapproved methods of mining, and to compel the lessee to leave the mine, upon termination of his lease by surrender or limitation, in a good, safe, workmanlike condition, and so that the lessor may, if he desires, further proceed with the operation of his property without the expense of reopening the same. But if it is concluded that the above-quoted clause constitutes an agreement 'to open, use, and work the mine in such manner as is usual and customary in successful mining operations of similar character when conducted by the proprietors themselves,' no evidence is recalled tending to show what is the usual custom of the proprietors of mining property respecting the opening up, using, and working thereof. Evidence was introduced touching the practice of lessees, but there are many considerations which would move a lessee to operate which would not affect the fee owner. We may not imply, in the absence of proof on the subject, what the fee owner would do, and if we were at liberty to do so, it cannot be said the implication would be warranted that the owner of a tract of land upon which iron is not known to exist, although financially able, would risk an outlay running possibly into $100,000, or even more, in searching for what he knew he might not find, when by standing by he could have the question whether ore existed on his land settled by the mining operations of his neighbor, without the risk of a single dollar.

"The fourth paragraph of the lease, which is commonly known as the 'minimum mining clause' reads:

" 'The party of the second part, having explored the said premises, represents that there exists thereon iron ore in paying quantities, and agrees that if in any calendar year, for any reason, it shall mine and remove less than ten thousand (10,000) tons of iron ore, it shall nevertheless pay as stipulated ground rent royalty at the rate of ten (10) cents per ton on ten thousand (10,000) tons; said ground rent to be paid quarterly and on the dates when royalty is due, as hereinbefore provided. If the ground rent has been paid in any year, and no ore or less than the minimum amount has been removed from the prop-

erty by the party of the second part, the royalty paid on ore not removed may be applied as payments of royalty on ore exceeding ten thousand (10,000) tons removed in any succeeding year, but no excess product of any year shall be applied to the deficiency of any succeeding year.'

"The language of this clause established beyond question that the lessor contemplated that in some years no ore would be mined, and, anticipating that the lessee might elect not to mine, and, in order that he should nevertheless have a settled, steady, annual net income from the property during the continuance of the lease, he exacted, and the lessee covenanted to pay, all taxes levied on the land, and in addition, $1,000 in each year when no ore was mined, and at least $1,000 in each year whether ore was mined or not. The right of the lessee to mine or not to mine is clearly recognized by this clause, not only when the mine would not produce 10,000 tons, or when the market would not take 10,000 tons, or when circumstances beyond control prevented the mining of 10,000 tons, but when, for any reason, mining from the point of view of the lessee was undesirable, and so, if we have evidence in the lease tending to support an implied covenant to operate, we have also in the lease evidence of equal, if not greater, weight, of opposite tendency, and therefore the raising of an implied covenant to operate is prevented by the familiar rule that an implied covenant will not be lightly raised, and never is justified, except where the evidence in support is clear and convincing.

"In support of the position that a covenant may, and that under the facts and circumstances of this case should, be found by implication, a long list of cases from other jurisdictions have been cited. These cases have been examined. Many of these cases concern leases for the operation of oil and gas wells. The effect of the subject-matter of such leases upon the development of the intention of the parties is apparent.

" 'Light will be thrown upon the language used, and the intention of the parties will be better reflected,' said Judge Van Devanter in *Brewster* v. *Zinc Co.*, 140 Fed. 801 [72 C. C. A. 213], 'if consideration is given to the peculiar and distinctive features of the mineral deposits which are the subjects of the lease.

Oil and gas are usually found in porous rock at considerable depths under the surface of the earth. Unlike coal, iron, and other minerals, they do not have a fixed situs under a particular portion of the surface, but are capable of flowing from place to place and of being drawn off by wells penetrating their natural reservoir at any point. They are part of the land, and belong to the owner so long as they are in it, or are subject to his control; but when they flow elsewhere, or are brought within the control of another by being drawn off through wells drilled in other land, the title of the former owner is gone. So, also, when one owner of the surface overlying the common reservoir exercises his right to extract them, the supply as to which other owners of the surface must exercise their rights, if at all, is proportionately diminished.'

"The subject-matter of an oil or gas lease is migratory while the subject-matter of an iron ore lease is not. The less gas or oil, as the case may be, drawn out, the less the property will produce, while the less iron ore taken out the more remains in the mine.

"Of the other cases cited it will be sufficient to say that in none of them was the lease, or the situation of the parties, or the illuminating circumstances and surroundings, similar to this case. To review all these cases would not be profitable, as, perhaps, the preceding review of this case was unnecessary, inasmuch as the question whether a covenant to mine may, by implication, be found in the lease under consideration is settled in the negative by the statutes and decisions of our own State.

"Section 8959, 3 Comp. Laws, provides:

" 'No covenant shall be implied in any conveyance of real estate, whether such conveyance contains special covenants or not.'

"Section 8994, 3 Comp. Laws, provides:

" 'The term "conveyance," as used in this chapter, shall be construed to embrace every instrument in writing, by which any estate or interest in real estate is created, aliened, mortgaged or assigned; or by which the title to any real estate may be affected in law or equity, except wills, leases for a term not exceeding three years, and executory contracts for the sale or purchase of lands.'

"Section 50, 1 Comp. Laws, provides:

" 'The word "land" or "lands" and the words "real estate" shall be construed to include lands, tenements, and real estate, and all rights thereto, and interest therein.'

"*Lieberthal* v. *Montgomery,* 121 Mich. 369 [80 N. W. 115], was an action brought to recover rent paid in advance for the use of a storeroom which was damaged by fire. There was no covenant in the lease, which was in writing, to repay the rent in case of fire, and it was held under section 8959, above quoted, that no such covenant could be implied. *Minnis* v. *Newbro-Gallogly Co.,* 174 Mich. 635 [140 N. W. 980, 44 L. R. A. (N. S.) 1110], was a bill by a tenant to compel his landlord to repair rooms occupied by the tenant which had been rendered untenantable by fire, and to decree damages for the failure of the landlord to make such repairs. The lease, which was for a term of nine years, did not contain a covenant on the part of the landlord to repair the premises. It was there held:

" 'There being no express covenant in this lease, on the part of defendant, to repair the premises, and the statute (section 8959, 3 Comp. Laws) referred to precluding, in our opinion, any inquiry as to whether or not a proper construction of the instrument might imply one, it follows that no relief in damages for breach or for specific performance could be granted, under the allegations and averments in complainant's bill.'

"See, also, *Thorkildsen* v. *Carpenter,* 120 Mich. 419 [79 N. W. 636], where it is held:

" 'Courts cannot read covenants into deeds. This would be in direct contravention of the statute.'

"*Ziegler* v. *Coal Co.,* 150 Mich. 82 [113 N. W. 775, 13 Am. & Eng. Ann. Cas. 90], where it is held: 'covenants cannot be implied in conveying real estate.'

"*Negaunee Iron Co.* v. *Iron Cliffs Co.,* 134 Mich. 264 [96 N. W. 468], and *Blake* v. *Lobb's Estate* [110 Mich. 608, 68 N. W. 427], are cited to the opposite effect. In neither of these cases was the question whether a covenant may be found in a deed or lease by implication involved, considered, or decided. In the *Negaunee Iron Co. Case* the meaning to be given certain words found in a deed was under considera-

tion, and the rule was reaffirmed that recourse may be had to the whole instrument, and, if need be, to the subject-matter of the transaction, the acts, conduct, and dealings of the parties, to ascertain the meaning to be given to any particular word or words found in such instrument. The case is authority for the position that the true intent and meaning of a covenant which is written in an instrument involving real estate may be found by construction, but it is not authority for the position that a covenant which is not written in the instrument may be added thereto by construction. Generally speaking, all rules of construction which obtain in relation to other written instruments are applicable to instruments of conveyance, with the exception that if the particular covenant claimed is not expressed in a writing involving real estate, the statute prohibits a search for it. In the *Blake Case* the court said: "The scheme of a mining lease implies that ore exists' on the land. That when dealing therewith some matters may be taken for granted by the courts is as true of instruments involving real estate as it is of other instruments. For example, that both parties contemplate the thing around which the contract is built exists is always implied as a matter of course.

"It is contended, further, that if no covenant can be implied in a mining lease, the lease in question is void for uncertainty, because, while it expressly confers on the lessee the right to mine, it does not expressly confer the right to remove iron ore from the premises. The lease provides for the payment of a royalty on all ore mined and 'removed' from the premises; that if the lessee shall mine and 'remove' less than 10,000 tons in any year, it shall nevertheless pay on that tonnage a stipulated ground rent; that if no ore, or less than the minimum amount has been 'removed' from the property, the royalty paid on ore not 'removed' may be applied as payment of royalty on ore exceeding 10,000 tons 'removed' in any succeeding year; that all ore mined and 'removed from said premises' shall be weighed in a manner indicated; and that the lessee may build railroads on the premises for the purpose of 'transporting' the ore therefrom. If more than the foregoing is necessary to show express permission to 'remove' ore, the lease

should not, for that reason, be avoided, but reformed. The option was 'for a lease for mining purposes and removing iron ore' from the described lands. That it was the intention of both parties to include in the lease the right of removal of the iron ore mined is undoubted, and if it is found to have been omitted, its omission was a mutual mistake. But whether the lease expressly permits the removal of the ore and, if not, what should be done are matters neither covered by the pleadings nor essential to dispose of in this case.

"But assuming that a covenant to operate the property may be implied, and that the Verona Company failed to perform such implied covenant, yet the right to forfeit the lease would not follow. The right of forfeiture is confined to the failure of the lessee respecting the covenants and conditions which are expressed in the lease, and does not arise upon the nonobservance of an implied covenant or condition. In *Miller* v. *Havens,* 51 Mich. 482 [16 N. W. 865], it is held:

" 'The common-law doctrine of forfeiture, being founded on strict feudal principles, is now believed to be unjust in many respects, and not applicable to the present state of society, and an interpretation which creates a forfeiture is not to be favored, * * * and statutes creating penalties and forfeitures should receive a strict construction. * * * Courts do not favor forfeitures, * * * and equity will not assist the recovery of a penalty or forfeiture, or anything in the nature of a forfeiture. * * * It has, for a very long period, been the policy of the law, and courts have felt it their duty in administering the law, so far as possible, to limit the effect of a clause or provision in a lease or statute by which a forfeiture is created.'

"*Hough* v. *Brown,* 104 Mich. 109 [62 N. W. 143], was replevin for certain crops, brought by the landlord against his tenant, upon the claim of forfeiture of and re-entry under the lease. It was there said:

" 'If it be conceded that the relettings were subject to the terms and conditions of the original lease, the provision relating to re-entry cannot be held to apply to implied covenants. Suppose that the new lease had been reduced to writing, and the agreement to turn over to the lessor one-third of the crops had been substituted for the agreement to pay a specific annual

rental, and then followed the clause providing that, should the tenant "fail in any of the foregoing premises," etc., can it be said that the right to declare a forfeiture followed a failure to perform a promise not expressed, but implied? We think not. The implied agreement must be regarded as a naked covenant, and the right of re-entry must be held to apply in case of default respecting express promises. Forfeiture clauses in a lease are not favored, and their effect will be restricted as far as possible.'

"*Somers* v. *Loose,* 127 Mich. 77 [86 N. W. 386], also was replevin for a quantity of hay, brought by the landlord against his tenant upon a claim of forfeiture of and re-entry under a lease. The lease contained no covenants as to husbandry, and it was there held:

" 'There being no express covenants as to husbandry, the clause in regard to re-entry does not apply to implied covenants.'

"In *Wakefield* v. *Mining Co.,* 85 Mich. 605 [49 N. W. 135], the court said:

" 'But it is claimed that defendant has violated the condition of the lease respecting the cutting of timber upon the lands in question. This, however, is not one of the acts or neglects for which a forfeiture may be declared, or a re-entry may be made, under the lease. The provisions regarding forfeiture will be strictly construed. The lease provides that: "If it shall so happen that the royalty or rent above reserved and agreed to be paid be behind or unpaid at the time or on the days above mentioned for the payment thereof, or in case said taxes or assessments are not paid in due and timely season, *or in case of the nonperformance* of any of the covenants made by said parties of the second part *at any of the times mentioned for the performance thereof*"—then a re-entry may be made. Mr. Wakefield, when asked regarding the cutting of the timber, replied: "I should expect that, if the tenant kept a lease—the life of the lease specifies 20 or 25 years—he would remove every stick of it, and a great deal more." The life of the lease is 30 years, and it was not strange that the parties were satisfied that this covenant should rest in contract alone, without the additional security of right of forfeiture.'

"In *Harris* v. *Oil Co.,* 57 Ohio St. 118 [48 N. E. 502], the syllabus reads:

" 'Where the forfeiture clause in such a lease is to the effect

that a failure on the part of the lessee to comply with the conditions, or pay the cash consideration in the lease mentioned, at the time and in the manner agreed, then the lease to be null and void, and not binding on either party, and oil being produced in paying quantities through wells drilled on the lands by the lessee under the lease: *Held*, that the lessee has a vested interest in the lands; that to work a forfeiture of the lease, there must be a breach of a condition or covenant which is mentioned in the lease; that a breach of an implied covenant does not work a forfeiture of the lease; and that certain causes * * * cannot be implied.'

"At page 131 [of 57 Ohio St., at page 506 of 48 N. E.] the court said:

"'It is strongly urged that it is inequitable for the lessee to hold onto his lease and still fail to so operate the premises as to produce reasonable results, and that he should either reasonably operate the premises or get off and permit his lease to be forfeited. The answer is that while there is an implied covenant to reasonably operate the premises, there is no implied or express covenant to get off and forfeit his lease for a breach of such covenant.

"'The lease in question provides for a forfeiture for the failure to comply with the conditions, or to pay the cash consideration in the lease mentioned, at the time and in the manner agreed; but the implied covenant, to reasonably operate the premises, is not mentioned in the lease, and is therefore not included in the causes of forfeiture. Some causes of forfeiture being expressly mentioned, none other can be implied. * * * The remedy for a breach of the implied covenant to reasonably operate the premises is therefore not by way of a forfeiture of the lease in whole or in part, but must be sought in a proper action for a breach of such covenant.'

"In Snyder on Mines, § 1292, the author says:

"'Nonpayment of rent is not always a forfeiture bearing covenant. It is only so when the parties make it so; and if the parties merely provide a certain rent without providing for forfeiture for nonpayment, a right of action for the rent, but no forfeiture, accrues to the lessor for nonpayment.'

"In *McKnight* v. *Kreutz*, 51 Pa. 232, it is held:

"'There is nothing in the words of the lease that can by any just construction be regarded as making the tenure of the lessee dependent upon his compliance with any other covenants

than those which relate to the rent. The utmost that can be made of the stipulation that the lessee should dig coal in such a manner as to do no injury to the surface of the land, and not spoil the coal itself, is that it constitutes a covenant, the breach of which may subject the lessee to liability for damages, but not to forfeiture of his estate. Conditions that work forfeitures are not favorites of the law, and nothing less than a clear expression of intention that a provision shall be such, will make it a condition upon which the continuance of an estate * * * depends. * * * Having expressed for what causes a forfeiture might be claimed, it is not to be inferred that there are any grounds of forfeiture not declared to be such.'

"It remains to consider whether the lease was in conflict with section 12, art. 18, of the Constitution in force at the time of its execution, which read:

" 'No lease or grant hereafter of agricultural lands for a longer period than twelve years, reserving any rent or service of any kind, shall be valid.'

"In the present Constitution the section reads as before, except the words 'for agricultural purposes' follow the word 'lands.'

"The surface of the De Grasse lands is suitable for agricultural purposes, and has, in fact, been farmed by Mr. De Grasse, or his grantees, each year since his entry thereof, as a homestead in 1884, and the claim is that because the surface is suitable for agriculture, a lease of the land for a longer period than 12 years, although for mining purposes, was void, in view of the Constitution as it then stood. This section of the Constitution has not been construed by the courts. It has, however, received a practical construction, and has not been regarded as prohibitive of leases of agricultural lands for any purpose exclusive of agriculture. Practically all lands in Michigan are agricultural lands. The prohibition of the Constitution did not take into account the size of the tract, or its grade as an agricultural proposition. While the Constitution of 1850 remained in force the lease of even a village lot for agricultural purposes for a longer period than 12 years was void, while, according to the construction universally accorded the section, a lease of the same lot, for the sole purpose of erecting a building for merchandising, was valid. So a lease

of the De Grasse lands for 50 years for agricultural purposes would have been void, but the lease thereof for the sole purpose of mining iron ore, which excluded the right to use the lands for agricultural purposes, was valid.

"It is suggested, and correctly, that this provision of the Constitution was borrowed from New York, and *Odell* v. *Durant,* 62 N. Y. 524; *Clark* v. *Barnes,* 76 N. Y. 301 [32 Am. Rep. 306], and *Massachusetts National Bank* v. *Shinn,* 163 N. Y. 360 [57 N. E. 611], are cited as sustaining the position that the lease was out of harmony with the Constitution. The conclusion reached by the complainants is not warranted by the New York decisions. The purpose of the constitutional provision in question was to announce the policy of the State of Michigan, in line with the policy of the State of New York, that long leases of agricultural lands, for agricultural purposes, were detrimental to the interests of agriculture, because the tenants had 'no desire to improve by the best mode of cultivation, an inheritance which was liable to pass from them or their descendants without compensation,' and a study of the New York cases will disclose the position of the New York courts to be that a lease of lands suitable for agriculture for a longer period than 12 years, for any purpose other than agriculture, and exclusive of the right of agriculture, is valid. Whether, therefore, the lease in question is brought within the saving effect of the New York decisions, it is necessary only to inquire whether the Verona Company was restricted by the terms of the lease to the use of the land for mining purposes, and that it was so restricted has been settled by the decisions of our own court. The lease was made 'for the purpose of conferring on the lessee the right to mine iron ore in and from the land,' with permission to erect buildings, put in engines and machinery, build, or authorize to be built, roads, including railroads and switches for the purpose of transporting supplies to any mine on the property, and transporting ore therefrom, and to do all such other things as might be necessary or convenient for the carrying on of iron ore mining on said premises. In *Harlow* v. *Iron Co.,* 36 Mich. 105, the court considered and disposed of this very question. The lease in that case contained language sub-

stantially the same as in the De Grasse lease.  The provision of the lease in the *Harlow Case* was 'for all the purposes of mining the iron ore and other minerals and for all the business of said mine containing ore  \*  \*  \*  including the incidental rights necessary for conducting mining.'  The syllabus reads:

" 'The lease in question in this cause is construed to be, not a lease of the lands, with the privilege of mining thereon, or together with the ore and minerals to be found upon the same, but a grant of a specific mining privilege, particularly set forth in the lease, in such manner as to exclude all other uses to which the lessee might otherwise have been entitled to put the premises; and to confer no right to the use or possession of the lands for any purpose whatever except as an incident to the mining right granted and in connection with the exercise of that right.'

"In the opinion (page 117 [of 36 Mich.]) the court said:

" 'When the right is thus defined in the lease, it is no longer a lease of the land, to be used by the lessee for such purposes, within the limits allowed by law, as he might deem proper, but to be used for a particular specific purpose, so far as might be necessary to the successful accomplishment of that purpose, and for none other.  A specific purpose, having been thus set forth in the lease, excludes all others which the lessee might otherwise have been entitled to.'

"In *Wertheimer* v. *Circuit Judge*, 83 Mich. 56, the court said:

" 'The words contained in the lease, "to be used for the sale of teas, coffee, spices, and similar goods," amounts to an express covenant not to be used for any other business.'

"In *Philadelphia Ball Club* v. *Lajoie*, 90 Am. St. Rep. 627, 643, note 5a, *Wertheimer* v. *Circuit Judge,* 83 Mich. 56 [47 N. W. 47], is cited with approval, and the courts say:

" 'If a lessee is by the terms of his lease restricted to a certain and particular use of the demised premises, equity will generally restrain him from any other use of them, even though no irreparable injury is shown to result from the breach.  \*  \*  \*  In other words, if a lessee covenants for a particular use of the demised premises, equity will restrict him to that

use by injunction. Covenants affecting the mode of occupation, use, and enjoyment of the leased premises run with the land, and the assignee of the lease, though not named, may be restrained by injunction from violating the covenant.'

"Passing the fact that Mr. De Grasse parted with his title to the lands in 1908, and that the present holders of the title do not claim their purchase to have been influenced by any promise or representation of any officer or agent of the Verona Company, and should any notice be taken of the claim, often repeated in the arguments and briefs of counsel for the complainants, that Mr. De Grasse was induced to sign the option and lease because of the alleged promises of Mr. Jobe, and the supposition that the lease included such promises, it is well settled that it is the duty of every one to use reasonable prudence to avoid deception. When the subject-matter of a representation is a fact not peculiarly within the knowledge of the party making the representation, but is one, as to which the party to whom the representation is made, has equal and available means and opportunity for information, and no fraud or artifice is used to prevent inquiry or investigation, he must make use of his means of knowledge, and, failing to do so, he is not allowed to claim he was misled. Whether or not the De Grasse lease was framed to oblige the Verona Company to operate was a matter Mr. De Grasse was as competent to pass upon as Mr. Jobe; at least it was a question which, upon inspection of the lease, any lawyer could answer better than Mr. Jobe; means to obtain the services of a lawyer were not wanting; opportunity to obtain the advice and instructions of a lawyer was open to Mr. De Grasse for over 20 days before he signed, during which time he had the option and form of lease in his own hands; no fraud or artifice was practiced by Mr. Jobe to prevent Mr. De Grasse from acquiring an exact understanding of the scope and effect of the instrument; on the contrary, Mr. Jobe distinctly cautioned Mr. De Grasse, as the latter admits, to take the option, to which was attached the form of lease, 'home and read it over.' If Mr. De Grasse neglected the duty which the law imposed upon him, his right, or the right of those claiming under him to assert he was misled,

may well be doubted. That Mr. De Grasse did not suppose the lease contained provisions requiring operation is the conclusion arrived at, but that he was persuaded by Mr. Jobe that, independent of the covenants of the lease, the company would explore and mine with reasonable diligence, and to a reasonable extent, and that unless he was so persuaded he would not have signed the option, is a fair inference from all the testimony in the case. In these circumstances the conscience of a court of equity might be moved to put in the lease a covenant which should, perhaps, have been put there originally, but not to say the instrument contains a covenant which it does not contain. If any rights belong to the complainants because of any operating promises made by Mr. Jobe, such rights should be recognized by reformation, and not by construction which would affect other innumerable leases although obtained under different circumstances. The inclination of the court to discover, if it existed, ground for correction of the lease was, however, promptly stifled by the declaration of the complainants that, in this proceeding, they were not seeking reformation, but annihilation, of the lease.

"No reason appearing why the relief prayed for by the complainants should be granted, a decree will be entered dismissing the bill of complaint with costs to the defendant Verona Mining Co. to be taxed."